# THE PEOPLE *ex rel.* John Longress

### *v.*

## THE BOARD OF EDUCATION OF THE CITY OF QUINCY.

*Filed at Springfield January 16, 1882.*

1. QUO WARRANTO—*when the proper remedy—where board of education undertakes to exercise powers it does not possess.* Under our statute an information in the nature of a *quo warranto* lies against a board of education when it undertakes to exercise any powers not conferred by law, and in such proceeding the legality of any rule adopted by the board for the admission of pupils in the public schools may be tested.

2. SCHOOLS—*colored pupils—discrimination against them as to what schools they may attend.* The board of education of the city of Quincy divided the city into eight school districts, and by proper rules provided that no pupil should enter a school out of the district in which he or she resided, without permission of the superintendent, etc. The board also adopted a rule that no pupil of African descent should be permitted to attend any of the public schools of the city other than those designated for their use, and that all the colored pupils in the city should attend a certain public school in said city called the Lincoln school, and no other: *Held,* that the board, under the constitution and laws of the State, had no authority to adopt and enforce the rule in relation to colored pupils.

3. Under the laws of Illinois, aside from the fourteenth amendment of the constitution of the United States, directors of schools and boards of education have no discretion to deny a pupil of the proper age admission to the public schools on account of nationality, color or religion. They all stand equal under the law, and no discrimination in that regard can be made.

WRIT OF ERROR to the Circuit Court of Adams county; the Hon. JOHN H. WILLIAMS, Judge, presiding.

Messrs. JOHN M. & JOHN MAYO PALMER, for the plaintiff in error, contended that under our statute an information would lie in a case like this. *Prima facie* the rules and regulations complained of are contrary to the policy of the State, are unreasonable, and are inconsistent with the laws. That the board of education have no power to make class distinctions on account of race or color, counsel cited *Chase* v. *Stephenson,* 71 Ill. 385.

Messrs. WHEAT & MARCY, for the defendants in error:

The question presented is, whether the case will authorize a judgment in *quo warranto*. At common law the office of this proceeding was two-fold, viz: first, to oust the corporation from an usurped franchise; and second, to punish the corporation or its members, by fine or dissolution, for the misuse of its lawful franchise. High on Extraordinary Remedies, secs. 679, 680.

But even for this purpose the proceeding must be against the officers or corporators, and not against the corporation itself. *Chicago* v. *People*, 80 Ill. 496.

That the information does not lie against a public officer or municipal corporation for a particular illegal act, see *People* v. *Whitcomb*, 55 Ill. 172; High on Extraordinary Remedies, secs. 618 (and note 6), 636, 686, 690 (and note 1); *State* v. *Lyons*, 31 Iowa, 432; *State* v. *Chahaba*, 30 Ala. 66; *Cleaver* v. *Commonwealth*, 34 Pa. St. 283.

The statute (Hurd's Stat. 1880, p. 800,) does not extend the remedy to cases like the present, because the phrase, "powers not conferred by law," occurring in section 1, refers to usurped franchises, not powers to do particular acts. This is the construction given to the precisely similar statute of Indiana. *State* v. *Kilbrick T. Co.* 38 Ind. 71.

The statute was never intended to apply to public corporations, the judgment authorized by section 6 being inapplicable to such corporations. *Chicago* v. *People*, 80 Ill. 511.

The information in the nature of a *quo warranto*, under our statute, is in effect a criminal prosecution. The judgment imposes punishment by fine or ouster, or both, and hence the present proceeding is entirely misdirected. If a penalty for misconduct is to be inflicted, it should fall upon the members of the board, and not upon the corporation. *Donelly* v. *People*, 11 Ill. 552; *People* v. *M. and A. R. R. Co.* 13 id. 66; *Wight* v. *People*, 15 id. 417; *Lavalle* v. *People*, 68 id. 252; *Attorney General* v. *Barstow*, 4 Wis. 803.

Again, it is settled that this proceeding does not lie to avoid the legislative action of a municipal body. High on Extraordinary Remedies, 689; *State* v. *Lyons,* 31 Iowa, 432.

Again, this remedy lies only when there is no other remedy. High on Extraordinary Remedies, 643, 645.

In this case *mandamus* lies. *Trustees* v. *People,* 87 Ill. 303.

Action lies for damages. *Rulison* v. *Post,* 79 Ill. 567.

Indictment lies. Rev. Stat. 1874, p. 983, secs. 100, 101.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the Court:

This was an information in the nature of a *quo warranto,* brought by the Attorney General, on the relation of John Longress, against the Board of Education of the City of Quincy, a corporation created by an act of the General Assembly, approved February 20, 1861. Private Laws of 1861, page 252. The board of education is entrusted by law with the exclusive management and control of the public schools in the city of Quincy.

It is alleged in the information, that the board of education did, on, to-wit, the 31st day of July, 1878, divide the city of Quincy into eight districts, suitable and convenient for the inhabitants of the city, and did establish and maintain in each of said districts an efficient and suitable public school, for the accommodation of all the *bona fide* residents of each of the districts between the ages of six and twenty-one years, and by proper rules providing that no pupil shall enter a school out of the district in which he or she resides, without permission of the superintendent, and that pupils, to be entitled to admission in any of the public schools, must be between the ages of six and twenty-one years, and *bona fide* residents of the city; and no pupil can be admitted into any public school without furnishing evidence to the principal that he or she has been vaccinated, or otherwise secured against the small-pox.

It is also averred in the information, that on the 31st
day of July, 1878, before that time and since, there was a
large number, to-wit, five hundred persons of African descent,
commonly called "colored persons," between the ages of six
and twenty-one years, who for all that time have been and
are now *bona fide* residents of said city of Quincy, and in the
several school districts thereof, and have been and are at
all times, and are now, ready to furnish to the principal of
the proper school satisfactory evidence that they have been
vaccinated; and the said persons do now reside, and at all
times heretofore have in good faith resided, in the differ-
ent school districts of said city so established by the said
The Board of Education of the City of Quincy, and are
entitled to be admitted into the public schools of the districts
in which they respectively reside, without being directly or
indirectly excluded therefrom on account of their descent or
color; yet the said The Board of Education of the City of
Quincy, during all the time aforesaid, without warrant or
authority of law, have adopted, maintained and enforced, for
the management of the public schools of said city, and to
exclude the said persons of African descent, commonly called
"colored persons," from the said public schools in the districts
in which they reside, on account of their descent and color,
the following pretended rules and regulations for the govern-
ment and management of the public schools of said city,
that is to say:   "That the colored schools of said city shall
be composed of colored pupils who shall be of the prescribed
age, and *bona fide* residents of said city; that no pupil of
African descent shall be permitted to attend any of the pub-
lic schools of the city other than the colored schools, and
that all the colored pupils in said city shall attend a certain
public school in said city, called the Lincoln school, and no
other."   All of which pretended rules and regulations for the
government and management of said public schools in said
city, the said The Board of Education of the said City of

Quincy, without authority of law, do maintain and enforce, to the damage of the People of the State of Illinois, and against the peace and dignity of the same.

The board of education filed five pleas to the information, to which the Attorney General interposed a demurrer, which the court carried back and sustained to the information, and this decision of the court is assigned for error.

Whether a proceeding in the nature of a *quo warranto*, instituted by the Attorney General, will lie in a case of this character at common law, is a question which it will not be necessary to determine. The object of the proceeding was to test the legality of the rules adopted by the board of education, and if the statute is broad enough to authorize the court to inquire into the action of the board in adopting and enforcing the rules which excluded children of color from the public schools, then the information was proper, and the court erred in sustaining the demurrer.

Sec. 1, chap. 112, Rev. Stat. 1874, p. 787, provides, "that in case any person shall usurp, intrude into, or unlawfully hold or execute any office or franchise, * * * or any corporation does or omits any act which amounts to a surrender or forfeiture of its rights and privileges as a corporation, or exercises powers not conferred by law, * * * the Attorney General, or State's attorney of the proper county, either of his own accord or at the instance of any individual relator, may present a petition to any court of record of competent jurisdiction, or any judge thereof, in vacation, for leave to file an information in the nature of a *quo warranto*, * * * and if such court or judge shall be satisfied that there is probable ground for the proceeding, the court or judge may grant the petition," etc.

The board of education is a corporation created by law, clothed with the exercise of certain powers in relation to the public schools of Quincy. Now, if the board, in the discharge of its duties as a corporation, exercises powers not

conferred by law, it is apparent that it will fall within the obvious meaning of the statute, unless the plain reading of the statute is to be disregarded. The very gist of the complaint here is, that the board of education, a corporation, is exercising powers not conferred by law, unless it had the right to adopt and enforce the rules set out in the information. We are therefore clearly of opinion that, under the statute, the Attorney General had the right to file the information.

This brings us to a consideration of the rules adopted and enforced by the board.

The board of education of the city of Quincy can exercise such powers, and only such, as are conferred upon it by the constitution and laws of the State. The inquiry then is, whether the rules adopted and enforced by the board, which exclude children of African descent from admission to the public schools which are provided for white children, are authorized by the laws of the State. It will not be necessary to determine what rights colored children had in our public schools prior to the adoption of our present constitution, as this case must be controlled by the terms of that instrument and the legislation which has followed since its adoption and ratification by the people.

Sec. 1, of art. 8, of the constitution of 1870, declares: "The General Assembly shall provide a thorough and efficient system of free schools, whereby *all* children of this State may receive a good common school education." In pursuance of this provision of the constitution, which makes no distinction in regard to the race or color of the children of the State who are entitled to share in the benefits to be derived from our public schools, the legislature, in 1872, passed an act to establish and maintain a system of free schools. (Laws of 1870, p. 700.) Sec. 48 of the act provides, that "the directors of each district shall be a body politic and corporate, under a certain name. They shall establish and keep in operation, for at least five months in

each year, and longer if practicable, a sufficient number of free schools for the proper accommodation of all children in the district, and shall secure to all such children the right and opportunity to an equal education in such free schools." This section of the act was doubtless framed and adopted in view of the constitutional provision heretofore cited, and shows the clear intent of the legislature to make all children, regardless of race or color, between the ages of six and twenty-one years, beneficiaries, and entitled to the same rights and privileges in our free schools.

It may be that, under the terms of sec. 79 of the act, the section cited did not apply fully and in all respects to a city like Quincy, acting under a special act; but that fact we do not regard as material, in view of subsequent legislation on the same subject. In March, 1874, the legislature passed an act entitled "An act to protect colored children in their rights to attend public schools," the first section of which declares, "that all directors of schools, boards of education, or other school officers whose duty it now is or may be hereafter to provide, in their respective jurisdictions, schools for the education of all children between the ages of six and twenty-one years, are prohibited from excluding, directly or indirectly, any such child from such school on account of the color of such child." This section of the statute is so plain, and its terms are so clear, that its purport can not be misunderstood.

Under the amendment of the constitution of the United States, persons of color are citizens of the United States, and of the State where they may reside. Being citizens of the State, upon an equality with other citizens, there can be no doubt in regard to the power of the legislature to provide that no discrimination shall be made on account of color by boards of education who have the management and control of our free schools. Has the board of education disregarded and violated this section of the statute? The answer to this,

in our judgment, can not admit of a reasonable doubt.    It
appears from the information, that the city of Quincy was
divided into eight school districts,—that colored children
reside in each of them.    Under the rules adopted, these col-
ored children are excluded from the public schools in the
district where they reside, and are all required to attend a
school composed exclusively of colored children, known as
the Lincoln school.    Under the operation of these rules a
colored child can not attend the school in the district where
such child resides, on account of its color, but is compelled
to travel perhaps several miles to a distant part of the city
to a colored school.    This is a direct violation of the statute,
which says the board is prohibited from excluding, directly
or indirectly, any such child from such school on account of
color.    Under the rules, no reason is assigned which pro-
hibits a colored child from attending the school in the dis-
trict where it resides, except on account of its color.

In *Chase* v. *Stephenson,* 71 Ill. 383, where a similar ques-
tion arose, the court said:    "While the directors very prop-
erly have large and discretionary powers in regard to the man-
agement and control of schools, in order to increase their
usefulness, they have no power to make class distinctions,
neither can they discriminate between scholars on account of
their color, race or social position.    The free schools of the
State are public institutions, and in their management and
control the law contemplates that they shall be so managed
that all children within the district between the ages of six
and twenty-one years, regardless of race or color, shall have
equal and the same rights to participate in the benefits to be
derived therefrom."

What was said in the case cited must be regarded as
authority here.

Much of the argument on behalf of defendants in error has
been directed to the point that the fourteenth amendment to
the constitution of the United States has no application to the

questions presented by this record. Whether the fourteenth amendment would prohibit school directors or boards of education from excluding colored children from the public schools by the adoption and enforcement of such rules as have been adopted in this case, is a question, which we do not deem it necessary to determine here. We base our decision on the constitution and laws of the State. The people of the State have the right to make such a constitution, and enact such laws under it, as they deem for the best interests of the public, and so long as our laws do not conflict with the constitution of the United States they must be held valid and binding upon the people of the State. Under our law, aside from the fourteenth amendment, directors of schools and boards of education, like defendants in error, have no discretion to deny a pupil of the proper age admission to the public schools on account of nationality, color or religion.

A like view of the same question was taken in *Clark* v. *Board of Directors*, 24 Iowa, 266, where it is said: "All the youth are equal before the law, and there is no discretion vested in the board of directors, or elsewhere, to interfere with or disturb that equality. The board of directors may exercise a uniform discretion, equally operative upon all, as to the residence, or qualifications, or freedom from contagious disease, or the like, of children, to entitle them to admission to each particular school; but the board can not, in their discretion or otherwise, deny a youth admission to any particular school because of his or her nationality, religion, color, clothing, or the like."

The case of *State* v. *McCann*, 21 Ohio St. 198, cited and relied upon, can have no bearing here, for the reason that boards of education in that State were authorized by statute to establish separate schools for colored children. *Roberts* v. *City of Boston*, 5 Cush. 198, relied upon by defendants in error, is distinguishable from this case. In Massachusetts,

when the case was decided, there was no statute in the State prohibiting the school authorities from establishing colored schools and excluding colored pupils from the other schools. It is there said: "In the absence of special legislation on this subject, the law has vested the power in the committee to regulate the system of distribution and classification, and when this power is reasonably exercised, without being abused or perverted by colorable pretences, the decision of the committee must be deemed conclusive."

*Ward* v. *Flood*, 48 Cal. 36, and *Carey* v. *Carter*, 48 Ind. 327, were both cases where the statute of the respective States provided for the education of white and colored children in separate schools.

In *Hall* v. *DeCuir*, 5 Otto, 506, the question here presented was not before the court, and what was said by Mr. Justice CLIFFORD in a separate opinion, in relation to the bearing of the fourteenth amendment of the constitution on the questions here involved, can not be regarded as authority here.

Whether our constitution, and the acts of the legislature passed in pursuance of it which place all children, regardless of color, upon a perfect equality so far as admission into the public schools is concerned, are to be regarded as wise or unwise legislation, is a matter with which courts have no concern. We are bound to declare the law as we find it written, and if it is not satisfactory to any section of the State, the remedy is in the legislative department of the government, and there alone.

In conclusion, we are of opinion that the board of education of the city of Quincy had no authority to adopt and enforce the rules set out in the information, and the judgment will be reversed and the cause remanded.

*Judgment reversed.*

Mr. Justice Walker, dissenting:

I am unable to hold that the writ of *quo warranto* can be maintained on the facts disclosed by this record. The constitutionality of the law under which the board of education is acting, the election or qualification of its members, their power to divide the city into school districts, and to use all of the powers conferred by the law under which they are acting to maintain schools, or that they are performing that duty, are not questioned. But the complaint is, that the board has provided a school house, and by a rule of the board require all of the colored children of school age in the city to attend that school, thereby excluding them from the other city schools. There is no complaint that this building is not as commodious, as well furnished, and supplied with as competent teachers, as either of the other city schools.

It is urged that the rule which requires these children to attend this particular school is a usurpation of franchises and powers not granted by the charter, and for that reason the writ will lie, and is the proper remedy. It can not be successfully contended that this board do not have the power to separate the school children to some extent, or for some purposes. That the board may separate the sexes, if not prohibited by law, or may provide school houses for children of particular ages or a certain advancement in education, or divide the same school into different grades, and require each to occupy separate rooms, I presume none will question. This is clearly a power the board possesses, and they usurp no power in its exercise. Possessing the power to separate to some extent and for some purposes, a mere mistake in its exercise, or a misapplication of the powers, surely can not be held a usurpation that must work a forfeiture of the charter and a dissolution of the corporation. And on a conviction, can any one suggest any other judgment sanctioned by the law that can be rendered? I am aware of no other, nor has any been suggested.

To carry out one of the great and most cherished objects of our government,—the education of the youth of the State,— the general school system has been adopted, and the General Assembly, to further the same object, has granted this and a large number of other special charters.    They, and the directors under the general law, are the instruments employed by the government to carry into effect this great purpose. This being true, can it be possible that districts under the general law, and under special charters, may be abolished by this writ because the directors or board of education may, as they all doubtless do, mistake their duties and powers? Is it possible that by this writ the whole system may be abolished, or greatly embarrassed, and its efficiency destroyed? Surely not.    And yet, if the writ will lie in this case, I can perceive no reason why it will not lie in every case where the board of directors, or of education, mistake their duty.    The purposes and the policy of the State can not be thus defeated, nor can we make arbitrary distinctions to prevent such results.

I hold that municipal bodies can not be dissolved by this writ, nor can corporations like this and other school districts be thus dissolved.    They are the creatures of the government, and are under legislative control, and when they abuse their powers, or usurp authority, the General Assembly will afford the correction by a repeal or amendment of their charters, if deemed necessary.    The courts will, by *mandamus* and injunction, compel an observance of duty, but should not, nor can they rightfully, dissolve such organizations.    If it were held that this writ would lie for such a purpose, then, under our statute, counties, cities, villages and townships could be dissolved by adjudging a forfeiture of their franchises, and townships and counties left without local government, which is indispensable under our institutions.    To my mind it is clear that no public corporation is amenable to this writ.

For what imaginable reason could the General Assembly have intended to confer power on the courts to dissolve a municipal body? Such organizations are created to serve the public, and are absolutely under the control of the General Assembly. If they or their officers abuse their power, the General Assembly may repeal their charter and terminate their existence, or impose penalties without a forfeiture being found and declared. Not so with private corporations, as they are not under legislative control, and their existence can only be terminated by surrender, or a forfeiture judicially declared. I therefore hold that the statute was not intended to, nor does it, confer such jurisdiction on the courts; but if it was, the creation, continuance and termination of municipal bodies is purely a legislative function. I can imagine nothing farther removed from judicial power than the creation or termination of a municipal corporation. The exercise of such a power by the court would be to encroach upon the legislative power of the government. The power is so purely legislative that its exercise can not, even by express enactment, be conferred on the judicial department without a violation of article 3 of the constitution, which distributes the powers of the government. Even if the statute can be construed as conferring power to declare a forfeiture of this charter, it would violate that article, as that power is vested in the legislature, and can not be delegated to either of the other branches.

The purpose of this writ is to correct public, and not private, wrongs. It is an extraordinary remedy, that can be employed only by consent of the court on application for the purpose, and is not a writ of right. It is used to oust usurpers into public offices, and to dissolve private corporate bodies which are usurping power that belongs to the government until legally granted to the body. It is a *quasi* criminal offence for a person to intrude into a public office to which he has not been legally elected or appointed, and so of indi-

viduals who usurp privileges and franchises which can only be rightfully exercised by virtue of a grant from government. Hence the government has a right to inquire and be informed by what right an individual is exercising governmental functions, or of persons exercising franchises, the source from which they are derived, and by what authority they are exercising them ; and on conviction they are punished for exercising governmental powers by usurpation and wrong. If we hold the writ lies for every mistake by an officer or corporate body, for every official act of the one, or corporate act of the other, and it can thus be brought before the courts, and every mistake visited with a forfeiture, I think we would violate the statute, as this could not have been intended by the General Assembly.

If the officers of the board acted maliciously, and the children have been deprived of any right, the officers of the board are individually liable in case for the damages sustained. If they acted in good faith, in the belief that they were acting within the scope of their power, but were mistaken, and have deprived the children of any legal right, *mandamus* will correct the wrong and restore the right. For these reasons the writ does not lie. It only lies where there is no other remedy given by the law, but here there are two other remedies.

As I hold the writ does not lie, I refrain from expressing any opinion on other questions presented and urged in argument. I think the judgment of the court below should be affirmed.