JAMES TOMETZ *et al.*, Appellees, *vs.* BOARD OF EDUCATION, WAUKEGAN CITY SCHOOL DISTRICT NO. 61, *et al.*, Appellants.

*Opinion filed May 29, 1968.*

594

House, Klingbiel and Kluczynski, JJ., dissenting.

Gerald C. Snyder, of Waukegan, (John F. Grady, and Richard J. Smith, of counsel,) for appellants.

Alexander Polikoff, Charles R. Markels, and Ronald Silverman, all of Chicago, for appellees.

Mr. Justice Ward delivered the opinion of the court:

On June 13, 1963, the legislature approved an amendment to section 10—21.3 of the Illinois School Code relating to the duties of school boards. (Ill. Rev. Stat. 1967, chap. 122, par. 10—21.3.) This amendment, commonly called the Armstrong Act, provides in part: "As soon as practicable, and from time to time thereafter, the board shall change or revise existing [attendance] units or create new units in a manner which will take into consideration the prevention of segregation and the elimination of separation

of children in public schools because of color, race or na-
tionality."

On August 4, 1965, the plaintiffs, seven children, by
their respective parents, instituted a suit in the circuit court
of Lake County claiming that the Waukegan City School
District had violated the Armstrong Act and seeking a
mandatory injunction requiring the district to revise the
boundaries of its school attendance units. The district and
the local board of education were named as defendants.

No boundary changes had been made in the school dis-
trict since the enactment of the Armstrong Act. At the
time suit was filed, the percentages of Caucasian and Negro
students in each of the district's attendance units were as
follows:

| Name of School | Percentage of Caucasians | Percentage of Negroes |
|---|---|---|
| Whittier | 15% | 85% |
| Clearview | 100% | 0% |
| Glen Flora | 98% | 2% |
| Glenwood | 100% | 0% |
| Hyde Park | 100% | 0% |

After suit had been filed, Dr. McCall, who was then the
superintendent of the defendant school district, was re-
quested by the board to make a study of the Whittier and
surrounding attendance units. Dr. McCall prepared a com-
prehensive report, which included four possible revisions
of the boundaries for the school district area, which were
designated plans 1, 2, 3, and 4. His observations concern-
ing each plan's feasibility and desirability were part of the
report. On June 13, 1966, the board considered the report,
which, though it described possible boundary changes, rec-
ommended that no changes be made, and voted to make no
revisions of attendance unit boundaries.

Trial was had on the plaintiffs' complaint and at its
conclusion on July 20, 1966, the court found *inter alia* that

the racial imbalance in the Whittier School area had not been created by any deliberate conduct on the part of the defendants and that the defendants had not been guilty of any intentional racial discrimination. Also, the trial court held that the Armstrong Act was constitutional and applicable to "so-called *de facto* segregation in schools, *i.e.,* racial imbalance in schools not created by the deliberate intent of a school board." The trial court judged that the defendants' failure to make any change in the boundaries of the district's attendance units was unreasonable under the circumstances and in violation of the Armstrong Act. The court therefore ordered the defendants to submit a plan making reasonable boundary revisions so as to "in some measure ameliorate the racial imbalance" in the attendance units concerned. August 4, 1966, was set for a hearing to consider the plan to be proposed.

On such date the trial court incorporated in its decree plan 2 of the McCall report with certain modifications. These modifications were proposed by Dr. Van Devander, the new school district superintendent, to improve the original plan 2 by avoiding certain traffic hazards and by more acceptably balancing class loads among the schools. Under the court's decree the distribution of Caucasian and Negro school children in the district was to be:

| Name of School | Percentage of Caucasians | Percentage of Negroes |
|---|---|---|
| Whittier | 57.4% | 42.6% |
| Clearview | 100% | 0% |
| Glen Flora | 83% | 17% |
| Glenwood | 83.6% | 16.4% |
| Hyde Park | 79.9% | 20.1% |

In this direct appeal the defendants challenge the constitutionality of the Armstrong Act, alleging that the Act's requirement that race be considered as a factor in changing or forming school attendance unit boundaries, constitutes a

racial classification comdemned by the equal protection clause and due process clause of the fourteenth amendment to the United States constitution and the due process clause of the Illinois constitution.

To support this claim, the defendants heavily rely on three Federal cases, each of which held, no State law being involved, that a local school board does not have an affirmative constitutional duty to act to alleviate racial imbalance in the schools that it did not cause. (*Deal* v. *Cincinnati Board of Education,* (6th cir. 1966) 369 F.2d 55, *cert.* denied 389 U.S. 847, 19 L. E. 2d 114, 88 S. Ct. 39; *Downs* v. *Board of Education of Kansas City,* (10th cir. 1964) 336 F.2d 988, *cert.* denied 380 U.S. 914, 13 L. Ed. 2d 800, 85 S. Ct. 898; *Bell* v. *School City of Gary, Indiana,* (7th cir. 1963) 324 F.2d 209, *cert.* denied 377 U.S. 924, 12 L. Ed. 2d 216, 84 S. Ct. 1223.) However, the question as to whether the constitution requires a local school board, or a State, to act to undo *de facto* school segregation is simply not here concerned. The issue here is whether the constitution permits, rather than prohibits, voluntary State action aimed toward reducing and eventually eliminating *de facto* school segregation.

State laws or administrative policies, directed toward the reduction and eventual elimination of *de facto* segregation of children in the schools and racial imbalance, have been approved by every high State court which has considered the issue. (Pennsylvania—*Pennsylvania Human Relations Com.* v. *Chester School District,* (Sept. 1967) 427 Pa. 157, 233 A.2d 290; Massachusetts—*School Committee of Boston* v. *Board of Education,* (June, 1967) —— Mass. ——, 227 N.E.2d 729, appeal dismissed, (Jan. 15, 1968) —— U.S. ——, 19 L. Ed. 2d 778, 88 S. Ct. 692; New Jersey—*Booker* v. *Board of Education of Plainfield,* (1965) 45 N.J. 161, 212 A.2d 1; *Morean* v. *Board of Education of Montclair,* (1964) 42 N.J. 237, 200 A.2d 97; California— *Jackson* v. *Pasadena City School District,* (1963) 59 Cal.

2d 876, 382 P.2d 878; New York—*Addabbo* v. *Donovan,*
(1965) 16 N.Y.2d 619, 209 N.E.2d 112, *cert.* denied 382
U.S. 905, 15 L. Ed. 2d 158, 86 S. Ct. 241; *Vetere* v. *Allen,*
(1965) 15 N.Y.2d 259, 206 N.E.2d 174; see also *Guida*
v. *Board of Education of City of New Haven,* (1965) 26
Conn. Sup. 121, 213 A.2d 843.) Similarly, the Federal
courts which have considered the issue, including *Deal* v.
*Cincinnati Board of Education,* (6th cir.) 369 F.2d 55,
*cert.* denied 389 U.S. 847, 19 L. Ed. 2d 114, 88 S. Ct. 39,·
relied on by the defendants, have recognized that voluntary
programs of local school authorities designed to alleviate
*de facto* segregation and racial imbalance in the schools
are not constitutionally forbidden. *E.g., Offermann* v. *Nit-
kowski,* (2d cir. 1967) 378 F.2d 22; *Deal* v. *Cincinnati
Board of Education,* (6th cir. 1966) 369 F.2d 55, 61, *cert.*
denied 389 U.S. 847, 19 L. Ed. 2d 114, 88 S. Ct. 39;
*Wanner* v. *County School Board of Arlington County,* (4th
cir. 1966) 357 F.2d 452, 455; *Springfield School Committee*
v. *Barksdale,* (1st cir. 1965) 348 F.2d 261; *Hobson* v.
*Hansen,* (D.D.C. 1967) 269 Fed. Supp. 401, 509, 510.

In *Springfield School Committee* v. *Barksdale,* (1st cir.
1965) 348 F.2d 261, the school authorities of Springfield,
Massachusetts, had passed a resolution to take appropriate
action "to eliminate to the fullest extent possible, [*de facto*]
racial concentration in the schools within the framework of
effective educational procedures." Addressing itself to this
resolution, the Court of Appeals for the First Circuit stated
at page 266 that: "It has been suggested that classification
by race is unlawful regardless of the worthiness of the
objective. We do not agree. The defendants' proposed ac-
tion does not concern race except insofar as race correlates
with proven deprivation of educational opportunity. This
evil satisfies whatever 'heavier burden of justification' there
may be. *Cf. McLaughlin* v. *State of Florida,* 1964, 379
U.S. 184, 194, 85 S. Ct. 283, 13 L. Ed. 2d 222. It would
seem no more unconstitutional to take into account plain-

tiffs' special characteristics and circumstances that have
been found to be occasioned by their color than it would
be to give special attention to physiological, psychological
or sociological variances from the norm occasioned by other
factors. That these differences happen to be associated with
a particular race is no reason for ignoring them. *Booker* v.
*Board of Education*, 1965, 45 N.J. 161, 212 A.2d 1 * * *."

In *Morean* v. *Board of Education of Montclair*, (1964)
42 N.J. 237, 200 A.2d 97, the Supreme Court of New Jersey
sustained the constitutionality of a school board's plan to
assign students from a predominantly Negro junior high
school to the town's three remaining junior high schools,
even though race had been a consideration. The court stated
there that: "The motivation was, to avoid creating a situa-
tion at Hillside [school] which would deprive the pupils
there of equal educational opportunities and subject them
to the harmful consequences of practical segregation. Con-
stitutional color blindness may be wholly apt when the
frame of reference is an attack on official efforts toward
segregation; it is not generally apt when the attack is on
official efforts toward the avoidance of segregation." 200
A.2d at 99; accord, *Offermann* v. *Nitkowski*, (2d cir.
1967) 378 F.2d 22, 24.

Also pertinent is the observation of the Supreme Court
of Pennsylvania in *Pennsylvania Human Relations Com.*
v. *Chester School District*, (Sept. 1967) 427 Pa. 157, 233
A.2d 290. In this case, which involved *de facto* segregation
in public schools, the court said: "The School District does
not suggest that it would be unconstitutional for the Legis-
lature to command them to consider race in their redistrict-
ing proposals in order to achieve a semblance of racial bal-
ance in its schools, nor do we believe there would be any
merit in such a contention." 233 A.2d at 294.

Too, the United States Supreme Court on January 15,
1968, dismissed an appeal in *School Committee of Boston*
v. *Board of Education*, (Mass. 1967) 227 N.E.2d 729,

which challenged the statute providing for elimination of racial imbalance in public schools "for want of a substantial federal question." —— U.S. ——, 19 L. Ed.2d 778, 88 S. Ct. 692.

The test of any legislative classification essentially is one of reasonableness. This court stated in *City of Chicago* v. *Vokes,* 28 Ill.2d 475, that neither the fourteenth amendment nor any provision of the Illinois constitution forbids legislative classifications reasonably calculated to promote or serve a proper police-power purpose. "Rather, they invalidate only enactments that are arbitrary, unreasonable and unrelated to the public purpose sought to be attained, or those which, although reasonably designed to promote the public interest, effect classifications which have no reasonable basis and are therefore arbitrary." (28 Ill.2d at 479; see *Chicago Real Estate Board* v. *City of Chicago,* 36 Ill.2d 530, 542, 543.) And, of course, the burden rests upon one assailing a statute or a classification in a law, to show that it does not rest upon any reasonable basis but is essentially arbitrary. *Thillens, Inc.* v. *Morey,* 11 Ill.2d 579, 591; *Stewart* v. *Brady,* 300 Ill. 425, 436.

Here, the legislature has directed school boards "as soon as practicable" to fix or revise the boundaries of school attendance units in a manner that "takes into consideration" the prevention and elimination of segregation. We cannot say that the legislature acted arbitrarily and without a reasonable basis in so directing the school boards of this State.

The legislature is necessarily vested with broad discretion to determine not only what the public interest and welfare require, but what measures are necessary to secure such interests. (*Thillens, Inc.* v. *Morey,* 11 Ill.2d 579, 593; *People* v. *City of Chicago,* 413 Ill. 83, 91.) We have said: "With the growth and development of the state, the police power necessarily develops, within reasonable bounds, to meet the changing conditions. The power is not circum-

scribed by precedent arising out of past conditions but is elastic and capable of expansion to keep up with human progress. It extends to the great public needs, that which is sanctioned by usage or held by prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare. *City of Aurora* v. *Burns,* 319 Ill. 84." (*People* v. *City of Chicago,* 413 Ill. 83, 91; accord, *Zelney* v. *Murphy,* 387 Ill. 492, 500.) Too, not to be disregarded is article VIII of the constitution which directs the general assembly to "provide a thorough and efficient system of free schools, whereby all children of this State may receive a good common school education." Ill. Const., art. VIII, sec. 1.

When, in *Brown* v. *Board of Education,* (1954) 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686, the Supreme Court declared unconstitutional *de jure* segregation in public schools, it made clear its position that all segregation of children solely on the basis of race deprives children of the minority group of equal educational opportunities. Though *Brown* directly concerned *de jure* segregation, segregation caused by official governmental action, courts since *Brown* have recognized that *de facto* segregation has a seriously limiting influence on educational opportunity. *Booker* v. *Board of Education of Plainfield,* (1965) 45 N.J. 161, 212 A.2d 1, 4, 5, 7; *Jackson* v. *Pasadena City School District,* (1963) 59 Cal.2d 876, 382 P.2d 878, 881, 882; *Pennsylvania Human Relations Com.* v. *Chester School District,* (1967) 427 Pa. 157, 233 A.2d 290; *Springfield School Committee* v. *Barksdale,* (D.C. Mass.) 237 F. Supp. 543, vacated on other grounds, 348 F.2d 261.

The fact that children other than Negro children may be deprived of equal educational opportunities does not form a constitutional impediment to the Act concerned. The legislature is not required to choose between legislating against all evils of the same genus or not legislating at all. It may recognize degrees of harm, confining itself to where

the need seems most acute. (*Chicago Real Estate Board v. City of Chicago,* 36 Ill.2d 530, 543-552; *Stewart* v. *Brady,* 300 Ill. 425, 436.) Too, the Armstrong Act would apply to the offensive segregation of school children of any "color, race or nationality."

We deem that neither the fourteenth amendment nor any provision of the Illinois constitution deprives the legislature of the authority to require school boards "as soon as practicable" to fix or change the boundaries of school attendance units "in a manner which will take into consideration" the prevention and eventual elimination of segregation.

It is apparent from what we have said that our view is that the Armstrong Act was designed to apply to *de facto* school segregation. Illinois has never been classified as a *de jure* segregation State. School authorities in Illinois were forbidden from separating or excluding school children based on race or color as early as 1874. (*Chase* v. *Stephenson,* 71 Ill. 383; Hurd. Rev. Stat. 1874, chap. 122, par. 100 (now Ill. Rev. Stat. 1967, chap. 122, par. 10—22.5); see also *People ex rel. Longress* v. *Board of Education of The City of Quincy,* (1882) 101 Ill. 308; *People ex rel Peair* v. *Board of Education of Upper Alton School Dist.,* 127 Ill. 613; *People ex rel. Bibb* v. *Mayor and Common Council of Alton,* 193 Ill. 309.) In 1954, the United States Supreme Court in *Brown* v. *Board of Education,* 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686, declared *de jure* school segregation by State action unconstitutional. Since then the unconstitutionality of *de jure* segregation has been clear. It would be unreasonable that our legislature, in 1963, in enacting the statute here concerned would be directing its attention superfluously to *de jure* rather than *de facto* school segregation, as defendants maintain. (Accord: *Pennsylvania Human Relations Com.* v. *Chester School District* (1967) 427 Pa. 157, 233 A.2d 290, 296.) We concur in the trial court's interpretation that the reference in the Armstrong Act to

the "elimination of separation of children in the public schools because of color" is intended to apply to *de facto* segregation.

Too, the appellants question whether the Armstrong Act is so imprecise in defining a school board's duty as to be unconstitutional.

The Act, revised section 10—21.3 of the Illinois School Code, (Ill. Rev. Stat. 1967, chap. 122, par. 10—21.3) does not refer to considerations traditionally relevant to the determination of school attendance unit boundaries such as classroom size, distances to school and traffic hazards. However, neither did the prior section 10—21.3 refer to these factors. It simply directed school boards then, as the present section does, to "establish one or more attendance units within the district." (Ill. Rev. Stat. 1961, chap. 122, par. 10—21.3, as originally enacted see 1951 Laws of Illinois, pp. 591, 593.) The omission, if it be considered such, does not invalidate the legislation. "When it is necessary, the legislature may commit to others the responsibility for the accomplishment of the details of its expressed purpose. The scope of permissible delegation must be measured in terms of the complexity and diversity of the conditions which will be encountered in the enforcement of the statute." (*Department of the Public Works and Buildings* v. *Lanter*, 413 Ill. 581, 589-90.) It is known that conditions certainly vary from school district to school district in Illinois and may vary within the same district. As we declared in a context resembling the present one: "It would be both impossible and undesirable for the legislature to draft rigid nondiscretionary standards which would embrace each and every school district boundary change, for conditions surrounding the changes are seldom the same." *School Dist. No. 79* v. *School Trustees*, 4 Ill.2d 533, 537-538; accord, *Schreiber* v. *County Board of School Trustees*, (1964) 31 Ill.2d 121, 126, 127.

We deem that the intention in the enactment was not

to eliminate or minimize consideration by boards of factors traditionally weighed in setting school boundaries. Rather, the intent was to direct school boards in forming or changing school units to take into consideration color, race and nationality so that segregation of children on such basis would be prevented and, where appropriate, eliminated.

The Act does not designate when a school is to be considered racially segregated or imbalanced. However, this does not mean the Act lacks adequate specificity to be constitutional. (Accord: *Pennsylvania Human Relations Com.* v. *Chester School District,* (1967) 427 Pa. 157, 233 A.2d 290, 301.) A statute need not always define each of its terms and detail each of its procedures. "It is only where the legislative act is so indefinite and uncertain that courts are unable to determine what the legislature intended, or when the act is so incomplete or inconsistent that it cannot be executed, that the law will be invalidated by reason of indefiniteness or uncertainty." (*People ex rel. Drobnick* v. *City of Waukegan,* 1 Ill.2d 456, 465; accord, *People ex rel. Christensen* v. *Board of Education,* 393 Ill. 345; *Husser* v. *Fouth,* 386 Ill. 188.) Here, the Act is capable of being executed. Terms such as "segregation" have a common and recognized meaning.

The Act does not contain any definition of the words "race" or "color". A similar objection was presented to the court in *School Committee of Boston* v. *Board of Education,* (1967) —— Mass. ——, 227 N.E.2d 729, where the Supreme Judicial Court of Massachusetts considered the constitutionality of a statute providing for the elimination of racial imbalance in public schools. The court cited its holding in *School Committee of New Bedford* v. *Commissioner of Education,* (1965) —— Mass. ——, 208 N.E.2d 814, 818 in dismissing the objection. In that case the court stated: "The city contends that no adequate standards for classifying students as 'white' and 'non-white' are laid down in the request for a racial census. We recognize the diffi-

culties which may arise in particular cases, particularly in communities with a heterogeneous population. These terms, however, seem to us reasonably susceptible of application by school superintendents and teachers for the present general purposes." We do not believe that the criteria of race and color can present substantial difficulty to a board in making a racial census. Here, Dr. McCall and the participating school personnel apparently encountered no problems in determining that the Glen Flora school was 98% Caucasian and the Whittier School 85% Negro. Also, as far as we can ascertain from cases dealing with problems of segregated schools, *de facto* or *de jure,* school authorities are not experiencing any significant difficulties in making color or race determinations of the type required by the Act.

The defendants also argue that the trial court improperly overruled the school board, which had concluded, based on considerations of traffic hazards, walking distances, finances and classroom capacity, that existing attendance unit boundaries should not be revised.

As stated, the Act provides that "as soon as practicable" a school board shall revise attendance unit boundaries "taking into consideration" the prevention and elimination of segregation. Here, a full hearing was conducted by the trial court at which the parties presented detailed evidence. At its conclusion, the trial court ruled *inter alia* that the defendants were in violation of the Armstrong Act and directed the alteration of school boundaries as described.

As the defendants state, the trial judge said that under the Act racial imbalance is a paramount consideration in drawing school attendance unit boundaries. However, it is clear from the opinion of the trial judge that he considered and did not disregard other relevant factors in arriving at his decision. The trial judge stated: "Defendants' evidence concerning traffic, distances of students from school, finances and classroom capacity are not determinative of the issues in the case at bar. In making this statement, the

Court does not mean to intimate that in a given case these factors could not be the determining factors and would override any factor of racial consideration. In a certain situation the Court feels this could be true. However, in the instant case, the Court is of the opinion that the evidence on these factors was not conclusive, and did not prove that a serious problem, or even one of very large proportions, existed in any of these categories: namely, traffic, distance, finance or classroom capacity." Later the court observed: "* * * in the case at hand, all of the attendance units involved are contiguous and in a general sense, constitute a neighborhood in the larger sense of the term. This is not an instance where units are separate, nor where any busing or transportation problems are involved."

The trial court found that no serious problems existed with reference to the so-called traditional considerations and that such considerations were outweighed by the factor of racial imbalance in the attendance units concerned.

We are not prepared, following a review of the record, to declare that the holding of the trial court was manifestly against the weight of the evidence or clearly unreasonable.

Accordingly, the judgment of the circuit court of Lake County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE HOUSE, dissenting:

What is particularly disturbing about the Armstrong Act is the fact that school authorities are, for the first time in the history of this State, told to make decisions based upon race and nationality. The majority opinion holds that racial discrimination under the Act is constitutionally permissible because it is for the benign purpose of equalizing the educational opportunity between Negroes and Caucasians. I am of the opinion, however, that "the fundamental principle that racial discrimination in public education is unconstitutional" (*Brown* v. *Board of Education,*

349 U.S. 294, 99 L. Ed. 1083, 75 S. Ct. 753) prevents a State legislature or school board from deciding what is benign and what is not benign with respect to racial discrimination in public education.

The opening statements of the Supreme Court in *Brown v. Board of Education,* 349 U.S. 294, 99 L. Ed. 1083, 75 S. Ct. 753, *(Brown II)* were "These cases were decided on May 17, 1954. The opinions of that date [cited in footnote: *Brown* v. *Board of Education,* 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686; *Bolling* v. *Sharpe,* 347 U.S. 497, 98 L. Ed. 884, 74 S. Ct. 693] declaring *the fundamental principle that racial discrimination in public education is unconstitutional* [emphasis added], are incorporated herein by reference. All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle." In the third paragraph of the opinion the court mentions "a system of 'public education freed of racial discrimination" and "steps to eliminate racial discrimination in public schools."

Racial discrimination is, of course, the act of making distinctions based on race. A reading of *Brown II* indicates that the principle announced in *Brown I* is a neutral principle like the neutral principles of freedom of speech, freedom of the press, freedom of religion and freedom of assembly. Just as these principles prohibit government from deciding what is benign or not benign with respect to speech, the press, religion or assembly, so the "fundamental principle that racial discrimination in public education is unconstitutional" prohibits government from deciding when racial discrimination in public education is benign and when it is not.

The Armstrong Act has the effect of ordering school boards to enter the field of racial classification. In 1874, this court ruled that "The free schools of the State are public institutions, and in their management and control the law contemplates that they should be so managed that all

children within the district * * * regardless of race or color, shall have equal and the same right to participate in the benefits to be derived therefrom. While the directors, very properly, have large and discretionary powers in regard to the management and control of schools, in order to increase their usefulness, they have no power to make class distinctions, * * *." (*Chase* v. *Stephenson,* 71 Ill. 383, 385; see also *People ex rel. Longress* v. *Board of Education of The City of Quincy,* 101 Ill. 308; *People ex rel. Peair* v. *Board of Education of Upper Alton School Dist.,* 127 Ill. 613; *People ex rel. Bibb* v. *Mayor and Common Council of Alton,* 193 Ill. 309.) Later that same year, the legislature prohibited school officials from excluding any child on account of color. (Rev. Stat. 1874, chap. 122, par. 100.) Such a prohibition has always been in our school law and is now contained in section 10—22.5 of the School Code. (Ill. Rev. Stat. 1965, chap. 122, par. 10—22.5.) Thus, from 1874 until the passage of the Armstrong Act there has been no doubt that school authorities in this State had no power to make class distinctions.

During this same period the fourteenth amendment has been construed as not prohibiting school authorities from making racial classifications (*Plessy* v. *Ferguson,* 163 U.S. 537, 41 L. Ed. 256, 16 S. Ct. 1138), and then as prohibiting school authorities from making racial classifications. (*Brown* v. *Board of Education,* 349 U.S. 294, 99 L. Ed. 1083, 75 S. Ct. 753.) History paints a sorry picture for the period when school authorities were permitted to make decisions based on race. The very gist of *Plessy* v. *Ferguson* was that racial discrimination resulting in segregation was benign as long as the separate facilities were equal. Experience, of course, proved this proposition wrong.

Several States have again entered the field of racial classification in education albeit for what they now consider a proper governmental goal. As one commentator has

pointed out, "This is exactly what the plaintiffs' attorneys urged the Supreme Court to prohibit in the *Brown* case, and for good reason. Although today a court might rule that the state is required to consider race in a benign way, tomorrow this might well prove a precedent for a much less happy result. Moreover, even today it is not easy to decide whether a given racial classification is benign." Kaplan, Segregation Litigation and the Schools—Part II: The General Northern Problem, 58 N.W.U.L. Rev. 157, 188 (1963).

Unfortunately the battle for equal educational opportunity is being fought as a racial one. This tends to generate heat rather than light. Even the strongest exponents for elimination of racial imbalance in the schools recognize and admit that denial of equal education opportunity is not limited to the Negroes. (See *e.g.*, Fiss, Racial Imbalance in the Public Schools; The Constitutional Concepts, 78 Harv. L. Rev. 564 (1963).) I believe that programs to create equal educational opportunities must, under the equal-protection clause of the fourteenth amendment (*Brown* v. *Board of Education*, 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686), and under section 22 of article IV of our constitution, be administered without regard to race. *Chase* v. *Stephenson*, 71 Ill. 383.

Several commentators have recognized the desirability of employing our traditional concept of general laws without regard to race to reach the problems of the disadvantaged in general, and Negroes in particular. For example, Professor Freund has stated, "Is not the constitution color blind? Can a preferential treatment of Negroes be squared with the requirement of equal protection of the laws? Is it not an unconstitutional discrimination in reverse? A head on clash of principle can be averted, in most cases wisely in my judgment, by framing programs of aid in terms of reaching the most disadvantaged segment of the

community, whether economically, or politically. And if these happen to be in fact predominantly Negroes, no principal of race-creed classification has been violated." (Freund, Civil Rights and the Limits of Law, 14 Buffalo L. Rev. 199, 204 (1964).) The Anti-Poverty Programs of the Federal government and our Public Aid Programs are good examples of the point.

Assuming racial discrimination is not a neutral principle, it should be noted that in those few States where action against racially imbalanced schools has been sustained, it has been done on the ground that it was for equality of educational opportunity. For example, in *Vetere v. Allen,* 15 N.Y.2d 259, 206 N.E.2d 174, which involved a determination of the commissioner of education directing a school board to reorganize attendance areas in a school district, the court stated, "Here the Board of Regents under authority of section 207 of the Education Law has declared racially imbalanced schools to be educationally inadequate. The Commissioner under section 301 and 305 of the Education Law has implemented this policy by directing local boards to take steps to eliminate racial imbalance. These administrative decisions are final absent a showing of pure arbitrariness."

If the purpose of the Armstrong Act is to eliminate racial imbalance, it would appear to be for integration *qua* integration without any determination that it would promote equal educational opportunities. As the trial judge pointed out, the Act does not mention factors such as traffic hazards, distance from home to school or overcrowding to be considered along with racial imbalance in fixing attendance unit lines. He concluded that elimination of racial imbalance is mandatory and the paramount consideration. Apparently the trial judge and the plaintiffs were aware that the legislature had not made a determination that elimination of racial imbalance will promote equal educational opportunities. Plaintiffs produced expert witnesses

who testified that racial imbalance impairs educational opportunity and the trial judge made a finding that racial imbalance can result in educational disadvantage (not that it did in this case), a finding that would be unnecessary if the legislature had made it when passing the Armstrong Act. The difference, in short, is that New York approached the problem as an educational one whereas our legislature approached it as a social problem.

It was the trial court, and not the legislature, who attempted to tie the social aspect to the educational aspect. Where the legislature has passed an act which it deems socially desirable, the courts should not, as did the trial court here, determine that it will improve educational opportunity. This is a matter for the legislature. Aside from the fact that the trial court should not make a legislative determination, we note parenthetically that a strong argument can be made for the position that the action of a trial court in changing the attendance units may have an adverse effect on the goal of obtaining equal educational opportunities. See Kaplan, Equal Justice in an Unequal World: Equality for the Negro—The Problem of Special Treatment, 61 N.W.U.L. Rev. 363, 403 (1966).

Finally assuming the legislature does have the power to vest school authorities with the power to change attendance units based on considerations of race and nationality, I believe it has done so without properly defining the terms under which the power is to be exercised.

The Act tells school boards to eliminate the "separation of children in public schools because of color, race or nationality." It was conceded by both parties that *separation of children in the Waukegan District was not because of color or race*. The trial judge avoided this difficulty by holding that "separation * * * because of color, race or nationality" was not to be taken literally as definitive of the origin of the separation but merely as descriptive of the .condition of separation. Whether this construction is or is

not correct, it demonstrates that the Act by its ambiguous terms would apply only to *de jure* segregation which has never been permitted in this State.

Now assuming "separation of children * * * because of color" means "elimination of racial imbalance regardless of its cause" there is nothing to indicate what constitutes an improper racial imbalance. It is not surprising, of course, that "racial imbalance" is not defined because the Act does not even use the term. The majority opinion glosses over this omission by the legislature by stating that "segregation" has a common and recognized meaning. In my reading of the cases and law review articles on this subject I have not come across this "common and recognized meaning" and I doubt that the school authorities will find it unless the legislature or this court states it.

One author has defined *de facto* segregation in this manner: "When the population of a community, or a public school system, is predominantly Negro, a school can be predominantly Negro and yet not be considered racially imbalanced. Moreover, a predominantly white school is not deemed racially imbalanced when the proportion of Negroes in the school substantially exceeds the proportion of Negro children in all of the public schools of the same grade level in the community. Although the proportion of Negroes in such a school may exceed the proportion of Negro children in all of the public schools of the same grade level, common usage does not apply the term 'racially imbalanced' unless the school is also predominantly Negro, for only when a school is both predominantly Negro and literally imbalanced is it viewed as a segregated school." Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv. L. Rev. 564, 565 (1963).

Another author would define a segregated Negro school as one which is known within its community as a Negro school. (Sedler, School Segregation in North and West: Legal Aspects, 7 St. Louis U.L.J. 228, 257 (1963).) A 60

per cent or 70 per cent Negro school might be considered a "Negro" school in some communities and not in others.

Still another author in commenting on the percentage method for determining imbalance has observed: "The plaintiffs in Gary, through their expert witness, argued that a school in a given community was segregated if its percentage of Negroes was more than one-third above or more than one-third below the percentage of Negroes in the community at large. The Urban Legaue, however, defines a segregated school as one which is over 60 per cent Negro." Kaplan, Segregation Litigation and the Schools—Part II: The General Northern Problem, 58 N.W.U.L. Rev. 157, 181 (1963).

Again we have the trial judge and a majority of this court deciding what the legislature has not. The trial court found that the revised attendance units were permissible under the Act, but there is nothing in the Act upon which to base this conclusion.

Another uncertainty created by the Act is its effect on the traditional and universally used neighborhood-school concept. The Act directs school boards to change attendance units, taking into consideration "the prevention of segregation" and "elimination of separation" of children of different color, race and nationality. The Act does not mention considerations of room capacity, distance from home to school, traffic hazards or any other relevant factors. Whether racial imbalance is just one factor to be considered with these traditionally relevant factors, as in *Balaban* v. *Rubin*, 14 N.Y.2d 193, 199 N.E.2d 375; or whether it is the "paramount" consideration, as the trial judge held; or whether it is the only consideration, as the Act indicates, creates a distinct uncertainty for school boards.

Again the majority opinion does what the legislature failed to do by stating, "We deem that the intention in the enactment was not to eliminate or minimize consideration by boards of factors traditionally weighed in setting school

614

boundaries. Rather, the intent was to direct school boards in forming or changing school units to take into consideration color, race and nationality so that segregation of children on such basis would be prevented and, where appropriate, 'eliminated'."

I recognize the problem of trying to provide equal educational opportunities in the State, but the legislature cannot delegate its authority without properly defining the terms under which this authority is to be exercised. This court has on many occasions held that a law vesting discretionary power in an administrative officer without properly defining the terms under which his discretion is to be exercised is void as an unlawful delegation of legislative power. (*Krebs* v. *Thompson*, 387 Ill. 471; *Department of Finance* v. *Cohen*, 369 Ill. 510; *Chicagoland Agencies, Inc.* v. *Palmer*, 364 Ill. 13; *People* v. *Beekman & Co.*, 347 Ill. 92.) This rule applies with equal force to a delegation of power to school authorities. *Richards* v. *Board of Education*, 21 Ill.2d 104.

For the preceding reasons, I would hold the Armstrong Act unconstitutional.

Mr. Justice Klingbiel and Mr. Justice Kluczynski join in this dissent.