AURORA EAST PUBLIC SCHOOL DISTRICT NO. 131 *et al.*, Plaintiffs-Appellees, *v.* JOSEPH M. CRONIN *et al.*, Defendants-Appellants.

Second District    No. 80-170

Opinion filed January 27, 1981.—Rehearing denied February 23, 1981.

UNVERZAGT, J., dissenting.

Julia Quinn Dempsey and David A. Thompson, and Thomas H. Morsch and Shalom L. Kohn, both of Sidley & Austin, all of Chicago, for appellants.

Lambert M. Ochsenschlager and Wayne F. Weiler, both of Reid, Ochsenschlager, Murphy & Hupp, of Aurora, for appellees.

Mr. JUSTICE VAN DEUSEN delivered the opinion of the court:

Defendants, Illinois State Superintendent of Education, Joseph Cronin, and the members of the Illinois State Board of Education, (hereinafter State Board), appeal from an order of the circuit court of Kane County entered on February 8, 1980, wherein the court granted plaintiff, Aurora East Public School District No. 131 (hereinafter Aurora), declaratory and injunctive relief. In its order, the court declared invalid and void, and permanently enjoined the enforcement of, the Rules Establishing Requirements and Procedures for the Elimination and Prevention of Racial Segregation in Schools (hereinafter Rules) which had

been promulgated by the State Board for the purpose of enforcing a 1963 amendment to section 10—21.3 of the School Code. The 1963 amendment to section 10—21.3 of the School Code provides, in relevant part, that:

" * * * As soon as practicable, and from time to time thereafter, the [local school] board shall change or revise existing [attendance] units or create new [attendance] units in a manner which will take into consideration the prevention of segregation and the elimination of separation of children in public schools because of color, race or nationality." (Ill. Rev. Stat. 1977, ch. 122, par. 10—21.3.)

The above amendment was commonly known as the Armstrong Act and will be referred to as such throughout this opinion.

The court's order also granted a judgment in favor of Aurora and against the State Board on the State Board's countercomplaint which alleged, in substance, that Aurora had failed to comply with the requirements of the Armstrong Act and with the Rules.

Most of the issues involved in this case are, basically, questions of law. Thus, as to those issues, there are few facts which require recitation. The only issue which requires an understanding of the facts is the issue regarding violation of the Armstrong Act. The following, therefore, contains those facts relevant to a determination of that issue. In addition, we set forth some background information with respect to the history of the relevant law.

Aurora East School District 131 is divided into 11 attendance zones or subdistricts for purposes of elementary school attendance. Each subdistrict contains one attendance unit, *i.e.*, an elementary school. The racial balance at each of Aurora's elementary schools is one of the issues in this case.

Aurora has changed its boundaries three times since the Armstrong Act became effective. These changes were effectuated in 1968, 1971 and 1977. The initial impetus for the boundary changes made in 1968 and 1971 was a series of space utilization studies begun in 1962 and conducted by Dr. Michael Sestak, who, at the time of trial, was assistant superintendent for Aurora. The studies revealed that certain elementary schools were either overcrowded or close to full capacity. As a result, new schools and school additions were built, necessitating the boundary changes.

Dr. James Cavanaugh, assistant superintendent for the elementary schools in the district at the time the space utilization studies were made, was responsible for recommending boundary changes to the local board of education. He explained the 1968 boundary changes, testifying that the space utilization studies were considered in planning the changes; but, also considered was available information on the race of the children who would be involved in the transfers and the distance students would have to travel if they were affected by the transfer. Dr. Cavanaugh explained

that, in considering race as a factor in making boundary changes, he necessarily had to rely upon anticipated enrollment figures which were often inaccurate, since it was unpredictable how many families would move into or out of the area designated for any given attendance unit. In considering race, Dr. Cavanaugh utilized anticipated enrollment reports, which were sent yearly to the Department of Health, Education and Welfare (HEW), and dot maps.

During the same year that Aurora first made boundary changes, the Illinois Supreme Court upheld the constitutionality of the Armstrong Act in *Tometz v. Board of Education* (1968), 39 Ill. 2d 593. The court found that the Armstrong Act's requirement, that race be considered in changing attendance boundaries, was applicable to *de facto* as well as deliberate segregation. (39 Ill. 2d 593, 602.) The court noted, however, that, while racial imbalance is one factor to be considered, other factors such as traffic, distances of students' homes from school, finances and classroom capacity are also factors to be taken into account and may, in a given case, be the determining factors and even override any factor of racial consideration. 39 Ill. 2d 593, 605-06.

In 1971, the Rules were first promulgated by Michael Bakalis, then the State Superintendent of Public Instruction. Subsequently, the legislature adopted what is known as the Moore amendment, which provides in pertinent part:

" * * * Nothing herein shall be construed to permit or empower the State Superintendent * * * to order, mandate or require busing or other transportation of pupils for the purpose of achieving racial balance in any school." (Ill. Rev. Stat. 1977, ch. 122, par. 10—22.5, eff. Oct. 1. 1973.)

In 1976, Joseph Cronin, Superintendent of State Board of Education,[1] promulgated the Rules at issue in the present case.

■■ The first issue we consider is whether the State Board has the authority to promulgate Rules to enforce the Armstrong Act. Recently, the Court of Appeals for the Seventh Circuit explicitly addressed this question in *Coates v. Illinois State Board of Education* (7th Cir. 1977), 559 F.2d 445. The court noted that the State Board has a duty "[t]o supervise all the public schools in the State" (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.3) and the concomitant power "[t]o make rules necessary to carry into efficient and uniform effect *all laws for establishing and maintaining free schools in the State*." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.6.) It thereafter found that the Armstrong Act (Ill. Rev. Stat. 1977, ch. 122, par. 10—21.3) was one law enacted for the purposes of establishing

---

[1] In 1975, the State Board of Education and its superintendent replaced the Office of the Superintendent of Public Instruction pursuant to section 1A—4C of the School Code (Ill. Rev. Stat. 1977, ch. 122, par. 1A—4C).

and maintaining free schools in this State. The court concluded and held that, under section 2—3.6 of the School Code, the State Superintendent has the power to make rules necessary to carry into efficient and uniform effect the local school board's charge under the Armstrong Act. The court found only one extrinsic limit on the State Superintendent regarding the regulations he may issue, *i.e.*, the "anti-busing clause" of the Moore amendment (Ill. Rev. Stat. 1977, ch. 122, par. 10—22.5). (559 F.2d 445, 448.) The court went on, however, to define the scope of the State Superintendent's authority. The court explained that the statutory scheme under the School Code does not grant the State Superintendent authority to actually determine attendance units and pupil assignments. This task, *i.e.*, "[a]ctual implementation," is left to the local school boards to be accomplished "within the *guiding boundaries* established by any Section 2—3.6 regulations which the State Superintendent has promulgated. * * * [T]he State Superintendent has an *overseer's responsibility* with respect to attendance units and pupil assignment * * *." (Emphasis added.) (559 F.2d 445, 448.) We believe *Coates* is determinative that the State Board has the authority to promulgate rules to carry out the Armstrong Act, and we agree with its reasoning and adhere to its ruling.

Having decided that the State Board has the required authority, the question becomes whether the present rules are a valid exercise of its authority. The legal principles regarding this issue are well established.

■■■ Generally, any power exercised by an adminstrative agency must find its source within the provisions of the statute by which it is created. (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 551.) An administrative agency has only such authority as is conferred by express provision of law or is found, by fair implication and intendment, to be incident to and included in the authority expressly conferred for the purpose of carrying out and accomplishing the objectives for which the agency was created. (*Karas v. Dixon* (1978), 67 Ill. App. 3d 736, 739; *Fahey v. Cook County Police Department Merit Board* (1974), 21 Ill. App. 3d 579, 583.) Thus, where an administrative agency promulgates rules which are beyond the scope of its legislative grant of authority, such rules are invalid. (*Cf. Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540; *Ruby Chevrolet, Inc. v. Department of Revenue* (1955), 6 Ill. 2d 147.) Similarly, to the extent that any administrative rule is in conflict with the statutory language under which the rule is adopted, it too is invalid. *Pye v. Marco* (1973), 13 Ill. App. 3d 923, 926.

When reviewing administrative rules and regulations, a court will not set them aside unless they are clearly arbitrary, unreasonable or capricious. (*Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 310; *Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 483; *Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d

264, 270-71.) Thus, this court must examine the provisions of the Rules to determine whether they exceed statutory authority or are otherwise arbitrary, unreasonable or capricious.

■■ The State Board contends that the trial court erred by failing to utilize the rules governing the construction of statutes which also govern the construction and interpretation of regulations promulgated by an administrative agency. (*Northern Illinois Automobile Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 58; *Olin Corp v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 483; *Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 273.) The State Board then sets forth several rules of construction including, *inter alia*, according substantial weight to an agency's construction and application of its own rules, interfering only if an agency's interpretation is plainly erroneous or inconsistent with long settled, uniform constructions (*Scheffki v. Board of Fire & Police Commissioners* (1974), 23 Ill. App. 3d 971, 973) and, as with statutes, affording the rules a presumption of validity (*Northern Illinois Automobile Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 58; *Du-Mont Ventilating Co. v. Department of Revenue* (1977), 52 Ill. App. 3d 59, 63), construing them as valid rather than invalid if such can be reasonably done (*cf. In re Tingle* (1977), 52 Ill. App. 3d 251, 257). The State Board argues that the trial court erred by failing to acknowledge or consider these rules of construction and by refusing to consider evidence pertaining to the history and development of the Rules.

■■ While the State Board has accurately set forth the rules of statutory construction, it fails to realize that the doctrine which requires a reviewing court to accord substantial discretion to an administrative agency in the construction of its own rules does not invite arbitrariness or inconsistency (*Scheffki v. Board of Fire & Police Commissioners* (1974), 23 Ill. App. 3d 971, 973) and that it is the function of the court to determine, as a matter of law, whether the agency acted within and according to the provisions of the statute creating it (*cf. People ex rel. Thompson v. Property Tax Appeal Board* (1974), 22 Ill. App. 3d 316, 322).

Moreover, it must be kept in mind that these rules are relatively new and are being challenged and tested for the first time. As such, the court's initial evaluation of them requires that they be examined on their face, standing alone. And there exists no long-settled or uniform construction or interpretation of the Rules which has been applied continuously by the State Board. (Compare *Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 483-85.) In fact, we have found no evidence whatsoever in the record revealing how, or in what manner, the State Board has generally construed and applied its Rules. Contrary to the State Board's contention that it has construed and therefore applied the rules in a uniform and consistent manner, we find the testimony quoted by the

State Board in support of that contention to be nothing more than mere conclusory statements; in no way does the quoted testimony indicate a uniform construction and application by the State Board in its determination of whether a local district is in compliance with the Rules. While examples of the Rules' application in other circumstances indeed would be helpful to this court in determining the meaning of the Rules, the State Board has not presented such evidence. We find no error by the trial court in this regard.

The trial court found the Rules to be invalid. To support its finding, the court discussed, at length, the operation of three specific provisions of the Rules. First, the court found the 15% plus or minus formula invalid in that it is a fixed standard for determining compliance with the dictates of the Armstrong Act; that it takes away, for its own use, discretion otherwise granted to local school authorities; and that it conflicts with the Moore amendment. Second, the trial court found that the enforcement provisions contained in the Rules go beyond the scope of authority which the legislature conferred on the State Board. Third, the court found that the hearing provisions of the Rules violate procedural due process. Before we proceed to a discussion of these provisions, we set forth a brief explanation of how the Rules operate.

Every year, local school districts must submit a report to the State Board. The report must include, *inter alia*, the racial composition of all pupils in the district and the racial composition of the student body at each attendance center (Rule 2.2). The State Superintendent reviews the report and determines whether any attendance centers are in nonconformance (Rule 3.1). Nonconformance is defined as the condition in which racial segregation exists in the schools, *i.e.*, the minority racial composition of the pupils in any attendance center fails to reflect, within 15 percentage points, the minority racial composition of the pupils in all attendance centers in the district (Rule 1.4). If a local district is in nonconformance, it is notified of this condition and of the reasons in support thereof and must submit a plan (Rule 3.2) within 90 days of receipt of the notice (Rule 5.1). The plan must seek to achieve conformance (Rule 4.1); it must detail specific actions and present a timetable for implementation and completion (Rule 5.2). Upon a finding that the plan meets the requirements of the Rule, the school is considered to be in compliance and must forthwith implement its plan (Rule 6.2). Thereafter, an annual review is made by the State Superintendent. If the plan is behind its timetable for implementation, the State Board may also find, after an investigation of the reasons why the school district is behind schedule, that the local district is in noncompliance (Rule 6.5). Essentially, noncompliance under the Rules is defined as the failure of a school authority to submit, amend or implement a plan in accordance with the aforementioned provisions (Rule 1.3).

The first basis for invalidating the Rules was a finding by the trial court that the 15% plus or minus formula is the controlling basis for determining whether the school board has complied with the provisions of the Armstrong Act. The State Board asserts that such is not the case and that compliance occurs when a school board submits an acceptable plan (Rule 1.3), not when a 15% plus or minus racial balance is achieved. The State Board argues that the 15% plus or minus range, as provided in its Rules, is used only as a starting point to determine nonconformance (Rule 1.4) and not as an end in determining compliance.

While the use of a mathematical ratio as a starting point from which integration may be accomplished has been sanctioned by the United States Supreme Court (*Swann v. Charlotte-Mecklenburg Board of Education* (1971), 402 U.S. 1, 25, 28 L. Ed. 2d 554, 572, 91 S. Ct. 1267, 1280), a reading of the Rules makes evident that the only acceptable plan is one which seeks to achieve absolute conformance with the requirements of the Rules, *i.e.*, the 15% plus or minus formula. The Rules define the existence of racial segregation as a condition in which the minority racial composition of the pupils in any attendance center fails to reflect, within 15 percentage points, the minority racial composition of the pupils in all attendance centers under a given school authority; hence, the 15% plus or minus formula becomes the *sine qua non* which the Rules impose as a standard on all local school boards. We agree with the trial court that the 15% plus or minus formula operates as the controlling basis for determining compliance.

■■■ We also determine that the State Board exceeded its authority by promulgating the Rules which make the 15% plus or minus formula the ultimate standard by which the State Board determines a local board's compliance with the dictates of the Armstrong Act. The role of the State Board in promulgating regulations to carry into efficient and uniform effect the requirements of the Armstrong Act is that of an "overseer," and the rules so promulgated should be mere "guiding boundaries." (*Coates v. Illinois State Board of Education* (7th Cir. 1977), 559 F.2d 445, 448.) Thus, in order to carry out the Armstrong Act, the Rules should be aimed at providing guidelines for local boards to follow and ensuring that, from time to time, they change their boundaries or attendance units "in a manner which will take into consideration the prevention and elimination of segregation." (See Ill. Rev. Stat. 1977, ch. 122, par. 10—21.3.) The phrase "take into consideration" is synonymous with "allow for," "make allowance for," "bear in mind," "remember," "realize," "appreciate," and "have in one's mind." (*Cf. Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 272, citing J. I. Rodale, The Synonym Finder.) It is clear that the question of the Rules' 15% plus or minus provision places on local districts a requirement significantly more burdensome than that

which the statutory language imposes. Indeed, the Rules, when read as a whole (*cf. Loyd v. Board of Education* (1977), 49 Ill. App. 3d 996, 1000), place an unrealistic and almost impossible task upon local school boards. In order to find that the Rules in question comport with the less demanding requirements of the Armstrong Act, we would have to presume that, whenever a local school district changes its attendance boundaries yet fails to meet the 15% plus or minus standard, it did not "take into consideration" the prevention and elimination of segregation. Such a presumption is illogical in light of economic, educational and administrative factors which our supreme court has determined may override any racial considerations. By its operation, the 15% plus or minus provision exceeds the State Board's responsibility as an overseer and its authority to promulgate guiding boundaries to carry out the requirements of the Armstrong Act.

■■ Further, by its application, the 15% plus or minus formula is in direct contravention of the decision in *Tometz*. The supreme court in *Tometz* found the prevention of segregation to be just one of several factors to be considered by a local board in setting boundaries. Traditional considerations such as educational, economic and administrative factors are also to be expored by a local board *before* determining boundary adjustments. Under the Rules, however, it is the failure to achieve a 15% plus or minus ratio alone which determines that a local board is in nonconformance and requires it to submit a plan. And it is not until a local board is found to be in nonconformance that the Rules grant it the power to consider other factors in formulating the plan to be submitted. Moreover, once a plan is submitted, it is the *State* Board which may consider the other factors, rather than the *local* board to which the State legislature has granted the discretion to consider the traditional factors set forth in *Tometz*. Thus, as the trial court noted, by its Rules the State Board has taken away, for its own use, the discretion granted to local boards by the Armstrong Act as construed by the supreme court in *Tometz*. In this regard, we conclude that the 15% plus or minus provision conflicts with the Armstrong Act and the Illinois Supreme Court's interpretation of the Act in *Tometz* and is therefore invalid. (*Cf. Pye v. Marco* (1973), 13 Ill. App. 3d 923, 926.) Administrative rules can neither limit nor extend the scope of a statute. *Du-Mont Ventilating Co. v. Department of Revenue* (1978), 73 Ill. 2d 243, 247-48.

Another basis upon which the trial court found the 15% plus or minus provision invalid is its potential for conflict with the Moore amendment. The court explained that, for example, where a local district cannot achieve conformance with the 15% rule by any involuntary means other than busing, it still must, in order to comply with the Rules, submit a plan

which will achieve that ratio. In effect, the State Board is thereby coercing the local district to implement busing in contravention of the Moore amendment.

The trial court noted two occasions in this case when the State Board specifically interpreted its Rules in contravention of the Moore amendment. On the first occasion, the State Board's intial offer of assistance to the local district was represented by a computer printout which reallocated the district's students to its various attendance centers, and the reallocation could not be accomplished without some busing. On the second occasion, the State Board refused to provide professional assistance limited to a consideration of alternatives which would not require busing.

In support of its conduct, the State Board argues that a local district should not automatically reject busing as a component of a desegregation plan, although the State Board concedes that a district may determine that the constraints enunciated in *Tometz* preclude busing. The State Board further argues that the district violates pupils' rights by failing to even consider a busing option where, as here, the district has previously bused pupils to alleviate overcrowding.

The State Board's argument fails for several reasons. First, by its mandatory language, the Moore amendment does not in any way permit the State Board to order, mandate or require a local school board to bus its students. Similarly, we do not believe the Moore amendment permits the State Board to require that a local board even *consider* busing. Second, Aurora created a task force which studied, in depth, the means available to achieve the 15% plus or minus racial balance. The task force found, in substance, that, with minor exceptions, none of the constraints enunciated in *Tometz* precludes busing. Third, we infer, from the mandatory language of the Moore amendment, that it leaves the consideration of busing, as an alternative to prevent and eliminate racial segregation, to the sole discretion of the local school district. In this regard, the fact that Aurora has, on one occasion, bused students to alleviate overcrowding is irrelevant to a consideration of busing in the instant case. Fourth, as the trial court noted, the State Board's denial of professional assistance limited to a consideration of alternatives other than busing violates its own Rule 4.3, which requires the State Board to furnish technical assistance promptly. We must presume that such assistance shall be effectuated without violating the Moore amendment.

Thus, the operation of the 15% plus or minus provision may, under certain circumstances, cause conflict with the Moore amendment and is invalid for that reason. (*Cf. Pye v. Marco* (1973), 13 Ill. App. 3d 923, 926.) And the Rules, generally, are invalid in this regard because they do not require the State Board to interpret them in a manner which will avoid

such a conflict. To find otherwise would permit the State Board to do indirectly that which it is specifically prohibited from accomplishing by direct means under the Moore amendment.

The second part of the Rules which the trial court found invalid was the enforcement provisions. The enforcement and penalty procedures under the Rules operate as follows. Where a local district is found to be in noncompliance, the State Board imposes a status of probationary recognition[2] on the local district. Once a school remains on probationary recognition status for one year, nonrecognition may be instituted by the State Superintendent. Under Rule 7.4(g), once nonrecognition is imposed, the State Board of Education notifies HEW that it declines to accept or expend any Federal funds available for allotment to such school district.

The trial court found that the State Board has no authority, under the School Code, to so withhold Federal funds from a local district as a sanction for noncompliance with the rules (Rule 7.4(g)). Contrary to the position advanced by the State Board, section 2—3.26 of the School Code (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.26) directs the State Board to accept and expend Federal funds allotted and available for school programs. The court further found that the sole enforcement power granted to the State Board under the School Code consists of the issuance or nonissuance of a certificate of recognition. (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.25.) The trial court noted that the State legislature provided its own remedy once a school is no longer recognized. The failure of a local district to maintain a recognized school for one year results in the automatic dissolution of the district (Ill. Rev. Stat. 1977, ch. 122, par. 5—32) and the disposal of its property and territory (Ill. Rev. Stat. 1977, ch. 127, par. 7—11). In light of these provisions, and because it found that the School Code granted the School Board no enforcement power other than nonrecognition, the trial court concluded, correctly so, that the power to withhold Federal funds was impliedly denied. (*Cf. Karas v. Dixon* (1978), 67 Ill. App. 3d 736.) To find otherwise would be to permit the State Board to usurp a power it does not possess and extend its authority beyond that provided to it by the legislature. *Cf. Du-Mont Ventilating Co. v. Department of Revenue* (1978), 73 Ill. 2d 243, 247-48.

The State Board argues that the trial court erred by failing to take cognizance of section 18—8(7) of the School Code (Ill. Rev. Stat. 1977, ch. 122, par. 18—8(7)) and further maintains that this section grants it the

---

[2] Under section 2—3.25 of the School Code (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.25), a school district is granted a certificate of recognition if the State Board determines that the district has complied with standards established by the State Board for, *inter alia*, instruction and teaching, curriculum, operation, maintenance, administration and supervision of the schools conducted under the School Code. A recognized school means any public school which meets the standards. See *Lenard v. Board of Education* (1978), 57 Ill. App. 3d 853, 863, *aff'd* (1979), 74 Ill. 2d 260.

power to withhold funds. The section in question provides that a school district which fails to maintain a recognized school is not eligible to file any claim upon the common school fund (Ill. Rev. Stat. 1977, ch. 122, par. 18—8(7)), which fund contains, in part, Federal revenue sharing dollars (see Ill. Rev. Stat. 1977, ch. 127, par. 144a). We find the State Board's argument to be fallacious. By enacting a statute which precludes the *local* school district from claiming money in the common fund, the legislature did not imply any grant of authority to the *State* board entitling it to decline acceptance of Federal funds (Rule 7.4).

The State Board further argues that under Federal law it has an affirmative duty to withhold funds. In support of this argument, the State Board sets forth the standard assurance form which it must sign in order to qualify for receipt of Federal funds. In substance, the form provides that, pursuant to the Civil Rights Act of 1964, no person shall be denied participation in, benefits of, or otherwise be subject to discrimination on the grounds of race, color or national origin under any program or activity for which Federal funds are used.

This argument also lacks merit. The fact that the State Board must sign such a Federal assurance form in no way grants authority to the State Board to promulgate a rule enabling it to decline acceptance of Federal funds allotted for the local district. The authority to do so may only be granted to the State Board by the Illinois Legislature. Our supreme court has consistently held that, inasmuch as an administrative agency is a creation of statute, any powers or authority claimed by it must find their source within the provisions of the statute by which it is created. *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 551, and cases cited therein.

██ We conclude that the State Board exceeded its scope of statutory power by promulgating a rule enabling it to decline acceptance of Federal funds.

The third part of the Rules which the trial court found invalid is the hearing provisions (Rule 7). The court below determined that the hearings which the Rules provide a local board are violative of procedural due process. Having found the Rules to be invalid for the foregoing reasons, we decline to consider the constitutional question. As a general policy, Illinois courts will only decide constitutional questions where necessary to a disposition of the case. (*City of Chicago v. Abdullah* (1979), 76 Ill. App. 3d 325, 328.) A court will not pass upon a constitutional dispute if the case can be decided without doing so. *People ex rel. Carey v. Route 53 Drive-In* (1976), 45 Ill. App. 3d 81, 83.

Finally, regarding the State Board's countercomplaint, it contends that the trial court's finding that Aurora had not violated the Armstrong Act was contrary to the manifest weight of the evidence. We find that the

State Board's arguments in support of its contention are not based upon the requirements of the Armstrong Act. Rather, the State Board reads into the Armstrong Act the significantly more demanding requirements it has imposed upon Aurora by the Rules which we have determined to be invalid.

The State Board presents, in its brief, a chart for 30 of Aurora's schools, indicating the percentage of minority pupils in attendance for a period of 8 years. From the chart, the State Board concludes that the percentages reflect isolation of these pupils in a racially identifiable manner. Such a conclusion is erroneous and is based upon a misinterpretation of the requirements of the Armstrong Act.

The Armstrong Act does not designate, specifically, when a school is to be considered racially segregated or imbalanced. (See *Tometz v. Board of Education* (1968), 39 Ill. 2d 593, 604.) Rather, the term "segregation," as used in the Armstrong Act, has generally been interpreted to have a common and recognized meaning. (*Tometz.*) The percentage figures set forth by the State Board reveal that the greatest percentage imbalance between minority and nonminority students occurred in 1977 in a school where 81% of the students attending were minority and 19% were not. These figures form no basis whatsoever for the State Board's conclusion that the pupils were isolated in a racially identifiable manner in violation of the Armstrong Act. If this court were to adopt such a conclusion, it would necessarily be required to read into the Armstrong Act some designated ratio which would be determinative as to whether racial segregation exists in any given school. Moreover, the State Board's conclusion requires a reading of the Armstrong Act which would mandate local school boards to alter any racial balance that is outside the designated ratio. Such an interpretation places a duty on local school boards more burdensome than that which the legislature has seen fit to impose by its enactment of the Armstrong Act as limited by the Moore amendment.

We have carefully reviewed the testimony and exhibits in this case and find that the manifest weight of the evidence supports the conclusion that Aurora has complied with the requirements of the Armstrong Act. Subsequent to the enactment of the Armstrong Act, Aurora built additions to several of its attendance centers and made boundary changes in 1968, 1971 and 1977. The numerous exhibits and testimony adduced at trial reveal that race and elimination of segregation were taken into consideration by the local district each time the boundaries were changed. Under these circumstances, we cannot conclude that Aurora has in any way violated the Armstrong Act.

The State Board's remaining arguments in support of its contention that Aurora has not complied with the Armstrong Act are also without

merit. These arguments include, *inter alia*, that (1) despite Aurora's 1968 boundary changes, the projected minority attendance anticipated an increase in minority attendance at schools with the highest minority percentages in the district; (2) the 1971 boundary change created a mere 3% change; (3) Aurora bused approximately 65 pupils in 1971 which resulted in an increase in minority population at a school which already had almost 70% minority attendance; (4) the 1977 reassignment was the only reassignment ever undertaken by Aurora solely for racial reasons; and (5) regarding certain schools, Aurora has not effectuated any changes since 1968.

The Armstrong Act does not require that a local school board conduct a minimum amount of activity or that its activity lead to a minimally acceptable result. The anticipated change in minority-nonminority balance which will occur as a result of any attendance revision is inaccurate and unpredictable. Dr. James Cavanaugh, assistant superintendent for the elementary schools in Aurora, testified regarding the complexity of deciding whether and how to effectuate an attendance reassignment. He explained that attendance reassignments are based on present enrollment figures and the anticipated enrollment figures for the following year. The anticipated figures are somewhat unpredictable, since families are constantly moving into and out of the area designated for each attendance unit. Thus, any prediction as to net effect of an attendance reassignment will always be imprecise. Moreover, it must be remembered that our supreme court has stated that traditional considerations, such as classroom capacity, may not only be determinative with respect to any attendance reassignment but may even override any factor of racial consideration. *Tometz*, at 605-06.

Thus, the task of student reassignment is a complex one; once a reassignment is completed, its results may be dictated by factors beyond the control or prediction of the local district.

Based on the foregoing analysis, we hold that the Rules Establishing Requirements and Procedures for the Elimination and Prevention of Racial Segregation in Schools are unreasonable and arbitrary and an invalid exercise of the State Board's authority to promulgate rules for the purpose of carrying into uniform and efficient effect the dictates of the Armstrong Act. We further hold that the manifest weight of the evidence supports the trial court's finding that Aurora has complied with the requirements of the Armstrong Act.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

NASH , J., concurs.

Mr. JUSTICE UNVERZAGT, dissenting:

I dissent from the thoughtful and scholarly opinion of the majority because I believe that the Illinois State Board of Education's Rules Establishing Requirements and Procedures for the Elimination and Prevention of Racial Segregation in Schools are reasonable, not arbitrary, and constitute a valid exercise of the State Board's authority to promulgate rules to carry into effect the requirements of the Armstrong Act.

I also dissent from the conclusion of the majority that the manifest weight of the evidence supports the trial court's finding that Aurora has complied with the requirements of the Armstrong Act.

The majority holds that the rules are invalid for the following reasons:
    (1) the 15% plus or minus formula is the ultimate standard by which the State Board determines a local board's compliance with the dictates of the Armstrong Act; and is in direct contradiction of the decision in *Tometz* and in conflict with the Moore amendment and (2) the rule enabling the State Board to decline the acceptance of Federal Funds for the benefit of the local school district exceeded the scope of its powers.

The Armstrong Act is clearly designed to prevent and eliminate the separation of pupils based upon race. In upholding the Armstrong Act, the supreme court in *Tometz v. Board of Education* (1968), 39 Ill. 2d 593, determined that the constitution permits, rather than prohibits, voluntary State action aimed toward reducing and eventually eliminating *de facto* school segregation. The court stated therein:

"State laws or administrative policies, directed toward the reduction and eventual elimination of *de facto* segregation of children in the schools and racial imbalance, have been approved by every high State court which has considered the issue." 39 Ill. 2d 593, 597.

*De facto* segregation, as addressed in *Tometz*, concerns racial imbalance, that which exists irrespective of intentional governmental action. To determine if racial imbalance exists, one must use some starting point.

The Rules define racial segregation as existing in any attendance center in a school district which has a minority enrollment which is more than 15 percentage points over or under the minority enrollment percentage for the district as a whole. (Rule 1.4.) As an example, when a district has an overall minority enrollment of 41% (as School District No. 131 had in 1976), each attendance center within the district may have a minority enrollment between 26% and 56% without being defined as racially segregated. Districts which have attendance centers which are segregated under this definition are required to take affirmative action to meet the objectives of the Armstrong Act.

The Rules contain a provision (Rule 6.1) for waiving strict confor-
mance with the percentage range if educational, economic or physical
factors similar to those outlined by the supreme court in *Tometz* make
conformance unduly burdensome on the school district.

The majority determines that the 15% plus or minus formula is the
ultimate standard by which the State Board determines a local board's
compliance with the dictates of the Armstrong Act. It is not an inflexible
15% standard, which is a requirement significantly more burdensome than
that which the statutory language of the Armstrong Act imposes. The
Rules themselves contain several provisions demonstrating that the 15%
standard is a starting point only, and will be administered flexibly.

The interpretation and construction of the rules of an administrative
agency generally are governed by the same rules applicable to statutes in
the same field. (See *Rucker v. Wabash R.R. Co.* (7th Cir. 1969), 418 F.2d
146.) In construing an administrative rule or regulation, a reviewing court
must necessarily look to the construction given the rule by the agency.
Although the construction of statutes and rules of an administrative
agency is not binding on the court, such construction should be persuasive.
(*Hardway v. Board of Education* (1971), 1 Ill. App. 3d 298.) The court
should accord substantial weight to the agency's construction and actual
application of its own rule and should not interfere unless the agency's
interpretation is plainly erroneous or inconsistent with long-settled con-
struction. *Scheffki v. Board of Fire & Police Commissioners* (1974), 23 Ill.
App. 3d 971.

Dr. Joseph M. Cronin, the State Superintendent of Education,
testified at length concerning the desegregation status of school districts
throughout the State under the Rules, and it would appear from that
extensive testimony that the Rules are applied by his agency in a uniform,
fair, flexible and reasonable manner.

The 15% provision is a definition of school districts which do not
conform. Such districts must submit plans to achieve compliance with all
of the requirements of the Rules. Districts may plan to directly reassign
pupils or districts may base plans on parents or pupils voluntarily
selecting a different attendance center. It is only in the instance of a
voluntary plan that the Rules require a backup plan if the voluntary plan
does not conform.

The Rules do not require that plans which involve involuntary pupil
assignments, including the backup plan, must meet an absolute 15%
standard. The basic applicable rule concerning all plans developed is
stated in Rule 5.3, which provides that "* * * school authorities shall
consider and employ all methods that are educationally sound and
administratively and economically feasible * * *."

In Rule 5.6, involving new schools, additions to schools or closing of

schools, it is provided that the district should give maximum effect to the 15% provision. Obviously, "maximum effect" may be something less than an absolute 15% requirement in view of the allowance for educational, economic and administrative constraints provided for in Rule 5.3.

In Rule 5.6, it is provided that all plans should be equitable and "within the constraints imposed by feasibility and educational soundness"; and inconvenience or burdens should not be borne disproportionately by a racially identifiable group of pupils.

The economic, educational or administrative constraints provided for in the Rules are the very criteria enunciated in *Tometz*. Reading the provisions of the Rules in *pari materia*, as statutes must be read, it is clear that the 15% standard is not fixed as an absolute rigid requirement. The sole criterion for measuring compliance with the Rules is not a strict application of the 15% provisions. Compliance with the Rules is the submission of an acceptable plan. While the 15% provision identifies which districts must submit a plan, and while the Rules encourage giving maximum effect to the 15% provision, nothing in the Rules requires that application of the 15% provision take precedence over the educational, economic, and administrative constraints also enunciated in the Rules. Other criteria of an acceptable plan include a detailed description of the specific actions to be proposed and a timetable showing dates of initial implementation[3] and completion (Rule 5.2) which is subject to annual review (Rule 6.5). Amendments to plans may be submitted to improve their effectiveness (Rule 5.9). It is self-evident that if a plan may contain a timetable for implementation which is subject to annual review, and plans may be amended to improve their effectiveness, the absolute compliance with the 15% provision is not required by the Rules.

The majority also finds that the operation of the 15% plus or minus provision may, under certain circumstances, cause conflict with the Moore Amendment and is invalid for that reason. The apparent logic used must be that if the State Board requires a school district to develop a plan, and the plan submitted contains a provision for busing, which is one of the many options available to local school districts, then the State Board has required busing in violation of the Moore Amendment. These Rules do not require busing, and I do not believe they conflict with the Moore Amendment.

The majority concludes that the State Board exceeded its scope of statutory power by promulgating a rule enabling it to decline acceptance of Federal funds. The majority ignores the provisions of section 18—8(7) of the School Code, which states that:

---

[3] The primary reason the plaintiffs were found to be in noncompliance was because the plan submitted was not time-frame specific.

"Any school district which fails * * * to maintain school as required by law, * * * is not eligible to file * * * any claim upon the common school fund." (Ill. Rev. Stat. 1979, ch. 122, par. 18—8(7).

Federal revenue sharing dollars are placed in the common school fund under section 8½ of "An Act relating to internal auditing in State government" (Ill. Rev. Stat. 1979, ch. 127, par. 144a.) Generally, Federal statutes control the purposes for which federal funds are expended. Section 2—3.26 of the School Code (Ill. Rev. Stat. 1979, ch. 122, par. 2—3.26) authorizes the State Board to receive Federal funds, but Federal law controls their expenditures. Numerous Federal laws require that recipients of Federal funds sign assurances that no money shall be expended to maintain segregated facilities. Once the State Board has reason to believe the signed assurances may be violated, it has an affirmative duty to take action. Therefore, the defendants would not exceed their authority if Federal funds were withheld as provided in Rule 7.4(9).

The majority finds that the manifest weight of the evidence supports the conclusion that Aurora has complied with the requirements of the Armstrong Act. I disagree.

Aurora East School District No. 131 operates 11 elementary schools for kindergarten through grade six.

In 1976, when 41% of the pupils of the school district were minority, 74% of the students attending the Beaupre Elementary School were minority; 78% of the students attending the Brady Elementary School were minority, and 70% of the students attending the Oak Park Elementary School were minority.

In 1976, the State Board informed the plaintiffs that they were out of conformance with the Rules in that the three elementary schools had excessive minority concentrations and requested that District No. 131 submit a plan to eliminate separation of students on the basis of race.

The plaintiffs submitted a plan which permitted voluntary pupil enrollment in other attendance centers and provided for the involuntary reassignment of 29 minority and 33 white students between two attendance centers out of approximately 5,000 elementary school pupils. The plan did not have a time-frame for implementation nor did it provide for reduction of racial isolation in the high minority schools. The defendants then determined that Aurora East School District No. 131 should be placed upon probationary recognition status for failure to submit an acceptable plan.

In an eight-year period from 1969 to 1977, Beaupre School went from 75% to 74% minority enrollment; Brady School went from 43% to 81%

1028

minority enrollment and Oak Park School went from 50% to 74% minority enrollment.

It is this very isolation of pupils in a racially identifiable manner which is addressed by the Armstrong Act, and it is clear from the record that Aurora never took any serious or meaningful affirmative action to eliminate segregation by redrawing boundaries or transferring students as the Act requires. This mandatory duty is tempered only by the educational, economic and physical constraints enunciated in *Tometz*.

I would reverse the trial court's finding that the Rules are invalid and void as against the manifest weight of the evidence and applicable law. I would also reverse the entry of judgment for the plaintiffs on the issue of whether the plaintiffs are in compliance with the Armstrong Act and enter judgment on the counterclaim in favor of the defendants.

