CHICAGO HEIGHTS PUBLIC SCHOOL DISTRICT 170, Cook County, Plaintiff-Appellee, *v.* ILLINOIS STATE BOARD OF EDUCATION *et al.*, Defendants-Appellants.

First District (5th Division)     No. 79-2449

Opinion filed June 5, 1981.

WILSON, J., dissenting.

Julia Quinn Dempsey, Rick·F. Orsinger, and David A. Thompson, all of Illinois State Board of Education, and Thomas H. Morsch and Shalom L. Kohn, both of Sidley & Austin, both of Chicago, for appellants.

Anthony Scariano and John F. Canna, both of Anthony Scariano & Associates, P. C., of Chicago Heights, for appellee.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Defendants, Illinois State Board of Education (State Board) and the State Superintendent of Education, Dr. Joseph Cronin (Superintendent), appeal from an order of the trial court granting plaintiff, Chicago Heights Public School District 170 (District 170) summary judgment on count I of its complaint for declaratory relief. In its order, the trial court found that the Rules Establishing Requirements and Procedures for the Elimination and Prevention of Racial Segregation in Schools (Rules), promulgated by the State Board were arbitrary, capricious and illegal. The court further prohibited the State Board from enforcing the Rules against District 170 or from initiating or continuing any administrative action based upon the Rules.

On appeal, the State Board contends that: (1) the Rules are within the authority delegated to the State Board by the legislature; (2) the trial court erred in finding that the "15% rule" contained in the Rules is a rigid and inflexible end in itself and is therefore illegal; and (3) the trial court improperly ruled that the Rules do not provide adequate due process procedures for the school districts so affected.

The Rules were promulgated in 1971 by Michael Bakalis, the then Superintendent of Public Instruction, and were amended in 1976 and 1977 by the State Board. They were enacted by the State Board for the purpose of enforcing a 1963 amendment to the Illinois School Code (Ill. Rev. Stat. 1977, ch. 122, par. 1—1 et seq.) commonly known as the Armstrong Act. The Armstrong Act provides that:

"As soon as practicable, and from time to time thereafter, the

board shall change or revise existing units or create new units in a manner which will take into consideration the prevention of segregation and the elimination of separation of children in public schools because of color, race or nationality." Ill. Rev. Stat. 1977, ch. 122, par. 10—21.3.

Generally, the Rules provide that "attendance centers" or schools defined as racially segregated must take affirmative steps to achieve racial balance within their districts. An attendance center is deemed racially segregated and, thus, in "nonconformance" with the Rules if the minority racial composition of the pupils in attendance fails to reflect, within 15 percentage points, the minority racial composition of the pupils in the district as a whole. (Rule 1.4.) For instance, if a school district's total number of enrolled minority students is 25 percent, then each attendance unit within that district may have a minority enrollment which ranges from between 10 percent and 40 percent of the total minority enrollment, yet still not be considered in nonconformance. If a local district is in nonconformance, it is notified of this condition by the State Superintendent of Education who specifies the deficiency and requires the submission of a plan to achieve conformance. (Rules 3.2, 4.1.) The plan must detail specific actions and present a timetable for implementation and completion. (Rule 5.2.) Upon a finding that the plan meets the requirements of the Rules, the school is considered in compliance and must forthwith implement the plan. (Rule 6.2.) Thereafter, an annual review is made by the State Superintendent. If the plan is behind its timetable for implementation, the State Board may also find, after an investigation, that the local district is in "noncompliance." (Rule 6.5.) Essentially, noncompliance, under the Rules, is defined as the failure or refusal of a school to submit, amend or implement a plan within the specified time limits. (Rule 1.3.) A school found to be in noncompliance is placed on "Probationary Recognition" status by the Superintendent. (Rule 7.1.) After any school has remained on probationary recognition status for one year without complying with the Rules, it may be placed, upon the refusal to request an administrative hearing, on "nonrecognition" status. (Rule 7.2.) Upon this change of status, the State Board will decline to accept or expend Federal funds otherwise available to the district. Rule 7.4(g).

Few facts concerning the present case require recitation, since the issues basically concern questions of law.

District 170 maintains and operates attendance centers for grades kindergarten through sixth at 10 school buildings. The district also maintains a single junior high school. In 1971, the district was informed that the Rules required submission of a report detailing the number of students of various racial groups enrolled in the district and a breakdown of the racial population of each attendance center within the district.

In a letter dated January 17, 1972, the Superintendent informed District 170 that it was not in compliance with the Rules.

After ensuing discussions between the parties, in 1974, the State Board again requested the submission of a plan enumerating the district's desegregation efforts. By letter, the district responded on June 3, 1974, that statistical compliance with the Rules required large-scale busing which was not feasible.

Nine months later, in March of 1975, the State Board informed District 170 that compliance with the Rules required a comprehensive desegregation plan, and that the June 3, 1974, letter-report did not constitute sufficient compliance.

On February 26, 1976, the State Board formally found District 170 to be in noncompliance with the Rules, as amended. The district submitted a plan to the State Board on April 7, 1976. Two weeks later, the State Board notified the district that the plan was deficient because it did not comply with the Rules. The district was placed on Probationary Recognition status effective April 21, 1976. Under the Rules, the probationary period was to last one year, but the State Board granted an extension until June 26, 1977, in order to permit the district time to review the desegregation plans submitted by a desegregation consultant employed by the Illinois Office of Education. District 170 submitted another plan on June 22, 1977.

In July of 1977, the Superintendent again notified the district that its plan was unacceptable under the Rules. The State Board then found the district to be in "continued noncompliance," and the district was served notice that, unless it requested an administrative hearing pursuant to the Rules, the district would be denied recognition 30 days from the receipt of the notice.

District 170 requested such a hearing in August of 1977 after the instant suit was filed, and subject to the condition that no hearing would be conducted until the court determined the legal issues raised in the complaint.

The trial court's order finding the Rules invalid was entered on November 21, 1979.

OPINION

The State Board first contends that the Rules it enacted are within the authority delegated to the Board by the legislature.

Recently, this very issue was decided by the Second District of the Illinois Appellate Court in *Aurora East Public School District No. 131 v. Cronin* (1981), 92 Ill. App. 3d 1010, 415 N.E.2d 1372. There, the court, relying on *Coates v. Illinois State Board of Education* (7th Cir. 1977), 559 F.2d 445, first found that the State Board has the authority to promulgate rules necessary to carry out the Armstrong Act. This authority was found

to have been based upon the State Board's duty "[t]o supervise all the public schools in the State" (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.3) and the concomitant power "[t]o make rules necessary to carry into efficient and uniform effect all laws for establishing and maintaining free schools in the State." (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.6.) However, the court in *Aurora* further found that the State Board exceeded its authority by promulgating the Rules which make the 15% plus or minus formula the ultimate standard by which the State Board determines a local board's compliance with the dictates of the Armstrong Act. The court stated:

> "It is clear that the question of the Rules' 15% plus or minus provision places on local districts a requirement significantly more burdensome than that which the statutory language [of the Armstrong Act] imposes." (*Aurora*, 92 Ill. App. 3d 1010, 1017-18, 415 N.E.2d 1372, 1378.)

The 15% Rule was also found by the *Aurora* court to be in direct contravention of the decision of *Tometz v. Board of Education* (1968), 39 Ill. 2d 593, 237 N.E.2d 498, which ruled that the prevention of segregation was just one of several factors to be considered by the local boards in setting attendance boundaries. In this regard, the Rules were deemed invalid since they gave the State Board rather than the local boards, to which the legislature had granted discretion, the authority to consider the factors set forth in *Tometz*.

The third basis discussed in *Aurora* for finding the 15% Rule invalid was that its operation could, under certain circumstances, conflict with the Moore Amendment (Ill. Rev. Stat. 1977, ch. 122, par. 10—22.5) which forbids the State Board from ordering, mandating or requiring busing to achieve racial balance in any school. This finding was premised upon the potential situation where a local district is unable to achieve conformance with the 15% Rule by any involuntary means other than busing, yet is required to submit a plan to achieve that rate in order to comply with the Rules. In effect, then, the State Board could coerce the local district to implement busing in violation of the Moore Amendment.

We believe that the *Aurora* decision is well reasoned and adhere to its holding. In the present case, the trial court specifically found that the 15% Rule is illegal. For the reasons elucidated in *Aurora*, the trial court's decision was proper.

The trial court in the instant case also found infirmities in the enforcement aspects of the Rules, including the absence of a provision for a stay of the sanctions pending judicial review. As we have mentioned, the State Board, under Rule 7.4(g) can decline to accept or expend any Federal funds available for allotment to a local district which is on nonrecognition status. In *Aurora*, the court examined this provision and found that the Board has no authority under the School Code (Ill. Rev.

Stat. 1977, ch. 122, par. 1—1 *et seq.*) to so withhold funds as a sanction for noncompliance with the Rules, and that the State Board exceeded its scope of statutory power by enacting a rule to this end. Therefore, the trial court's belief that the Rules were invalid due to their faulty enforcement provisions is supported by *Aurora*, although on a different basis.

The State Board's final issue is that the trial court erroneously concluded that the Rules do not provide adequate due process procedures to school district affected by the Rules.

We need not decide this constitutional question, however, since we have adhered to the ruling in *Aurora* that the Rules are invalid. A court will not pass upon a constitutional dispute if the case can be decided without doing so. See *Aurora; City of Chicago v. Abdullah* (1979), 76 Ill. App. 3d 325, 395 N.E.2d 50.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P. J., concurs.

Mr. JUSTICE WILSON, dissenting:

I dissent from my brethren's opinion because I believe the Rules enunciated by the State Board of Education are not arbitrary, or unreasonable, and validly constitute an exercise of the State Board's lawful authority to promulgate rules to effectuate the objective of the Armstrong Act.

I also respectfully dissent from the majority opinion which supports the trial court's finding that the "15% Rule" contained in the Rules is a rigid and inflexible end in itself and is therefore illegal. The majority adopts the reasoning of the recent Second District opinion, *Aurora East Public School District No. 131 v. Cronin,*[1] with one Justice dissenting, which stated that:

> "(1) the 15% plus or minus formula is the ultimate standard by which the State Board determines a local board's compliance with the dictates of the Armstrong Act, which is more burdensome than that which is anticipated by the statute's language;
>
> (2) the 15% Rule is in direct contravention of the decision of *Tometz v. Board of Education,* which held that prevention of segregation was just one of several factors to be considered by the local boards in setting attendance boundaries;
>
> (3) the 15% Rule could under certain circumstances conflict with the Moore Amendment; and finally

[1] Petition for leave to appeal has been filed in the Illinois Supreme Court.

"(4) there are infirmities in the enforcement aspects of the Rules, including the absence of a provision for a stay of sanctions pending judicial review."

The policy objectives of the Armstrong Act are to prevent and eliminate racial segregation of pupils. The Rules enunciated by the State Board to effectuate this objective were deemed to exceed the authority delegated to the State Board by the legislature. (*Aurora East Public School District No. 131 v. Cronin.*) Courts generally adhere to the doctrine that interpretation and construction of rules of an administrative agency are governed by the same rules applicable to statutes in the same field. (*Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 370 N.E.2d 3.) The interpretation of a statute by the agency charged with its administration, while not binding on the courts, is entitled to substantial deference (*Milkowski v. Department of Labor* (1980), 82 Ill. App. 3d 220, 402 N.E.2d 646) and such construction should be persuasive. (*Milkowski; Olin.*) The court should accord substantial weight to the agency construction and actual application of its own rule and should not interfere unless the agency's interpretation is plainly erroneous or inconsistent with long settled constructions. *Olin; Scheffki v. Board of Fire and Police Commissioners* (1974), 23 Ill. App. 3d 971, 320 N.E.2d 371.

The necessity of the use of a numerical standard as a starting point to measure the progress of integration has been sanctioned by the United States Supreme Court. (*Swann v. Charlotte-Mecklenburg Board of Education* (1971), 402 U.S. 1, 28 L. Ed. 2d 554, 91 S. Ct. 1267.) We should consider then the 15% provision as the starting guide which measures the progress of integration for implementation of the Armstrong Act. It is not the absolute end, as the majority believes, by which the State Board determines a local district's compliance. This is evident from the language of the Rules themselves, which must be read in conjunction with one another. Initially, it acts as a diagnostic tool to determine those school districts in which there is a significant racial imbalance. (Rule 1.4.) From this point, the State Board requires the local authorities, upon notification, to submit a plan to correct deficiencies and achieve conformance. Rule 5.3 provides that "* * * school authorities shall consider and employ all methods that are educationally sound and administratively and economically feasible * * *." Local school authorities are required to commit themselves to the fulfillment of the requirements of the Rules (Rule 5.2), the objective of which is to implement the Armstrong Act, which seeks an end to racial segregation of pupils. Rule 5.5 requires school authorities to give "maximum effect" to the requirements of the Rules; however, there is an allowance for educational, economic and administrative constraints. Further, Rule 5.6 provides that equitable plans be submitted "within the constraints imposed by feasibility and educational soundness"; and the

"inconvenience or burdens" of desegregation are to be apportioned among all pupils. Additionally, Rule 5.9 allows for amendments to improve the effectiveness of plans submitted.

As such, it is clear that the 15% Rule is not the sole criterion for measuring compliance. In fact, the majority's rationale is undermined by Rule 6.1 which provides that, "Where educational, physical or economic constraints would place an unreasonable burden upon the school authority in completely confirming" the State Board is empowered to relax the necessity of complete conformance. Thus, I do not understand the numerical rigidity the majority speaks of as there is sufficient flexibility in the Rules to implement the Armstrong Act.

Nor do I believe that the Rules violate the Moore Amendment, which prohibits the State Board from requiring busing to achieve racial balance. All the Rules require is submission of an acceptable plan and there is no mention of busing.

Further, the majority upholds the trial court's findings of infirmities in the enforcement aspects of the Rules, including the absence of a provision for a stay of sanctions pending judicial review. This issue is directly correlated to the trial court's finding that the Rules do not provide adequate due process procedures to school districts affected by the Rules. The majority opinion did not consider the due process question. There is a considerable time delay involved from the initial determination of nonconformance under Rule 1.4 to the finding of "noncompliance" under Rule 1.3 and the subsequent implementation of sanctions. The time, processes and other procedural requirements afford adequate safeguards and mitigates against the misconception surrounding the "harshness" of the sanction provision as well as nullifies the trial court's finding that there is a lack of opportunity for due process procedures for school districts deemed to be in violation of the Rules.

If we are to give any effect to the directive of the Armstrong Act, the Rules provide that a school district must submit an acceptable plan. What constitutes an acceptable plan is a determination to be made by the State Board giving consideration to the economic, administrative and educational constraints that *Tometz* advanced. We do not regard the Rules as being in violation or in contravention of the decision in *Tometz* since they include the very criteria enunciated in *Tometz*.

The Rules require that a school authority receive notification of nonconformance and it then has 90 days to submit an acceptable plan. This time can be extended up to 180 days from the original notification. Schools then have 60 days to amend plans, which are unacceptable, before they are in noncompliance. Once a district's plan is deemed to be unacceptable or in noncompliance, that district is entitled within 30 days to request a hearing under Rule 7.1(c). The district is entitled to present

whatever evidence it has to contest the State Board's finding of noncompliance, which, we must keep in mind, was based on the evidence submitted to it by the local board initially.

A school in noncompliance remains on probationary recognition status for a period of one year, upon which the State Board within 30 days then serves notice, with the complaint attached, that another hearing may be requested. If no hearing is requested, nonrecognition status or other measures may be instituted. If a hearing is requested, no sanctions are imposed pending the outcome of the hearing. If the State Board, after reviewing the findings and recommendations of the hearing officer, determines that the district is in a state of continued noncompliance, it is not obligated to place that school on nonrecognition status, perhaps necessitating a cut-off of funds, but may, under Rule 7.4(f), adopt such measures which would lessen the burden upon the schools involved.

Thus, it is clear that any infirmities in the enforcement aspects of the Rules are minimal, because of the latitude the Rules afford school authorities to comply. And it is equally apparent that the Rules afford more than ample due process in the compliance and hearing procedures to ensure fairness and impartiality to local school districts. All due process requires is adequate notice, and a full, fair and impartial hearing. *Piotrowski v. State Police Merit Board* (1980), 85 Ill. App. 3d 369, 406 N.E.2d 863.

I must again emphasize that the directive of the Armstrong Act is to achieve racial balancing of pupils. While the Act itself does not impose a specific deadline, I believe the legislature intended that its objective be carried out without delay. The Rules implicitly reflect this intent to implement a program to expedite the Act's objective allowing sufficient flexibility pursuant to a timetable.

For these reasons, I would reverse the trial court's finding that the Rules are unreasonable and therefore invalid. Further, I would enter judgment for the State Board allowing them to enforce the Rules against District 170 and initiate or continue any other administrative action based upon the Rules.