(No. 54738, 55134 cons.—)

AURORA EAST PUBLIC SCHOOL DISTRICT NO. 131 *et al.*, Appellees, v. JOSEPH M. CRONIN, State Superintendent of Education, *et al.*, Appellants.—THE BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 170 *et al.*, Appellees, v. JOSEPH M. CRONIN, State Superintendent of Education *et al.*, Appellants.

*Opinion filed October 22, 1982.*

314

316

SIMON, J., took no part.

Thomas H. Morsch and Shalom L. Kohn, of Sidley & Austin, and Julia Quinn Dempsey and David A. Thompson, all of Chicago, for appellants.

Lambert M. Ochsenschlager and Wayne F. Weiler, of Reid, Ochsenschlager, Murphy, and Hupp, of Aurora, for appellee Aurora East Public School District No. 131.

Thomas H. Morsch and Shalom L. Kohn, of Sidley & Austin, and Julia Quinn Dempsey and David A. Thompson, all of Chicago, for appellants.

Anthony Scariano and Robert H. Ellch, of Anthony Scariano & Associates, P.C., of Chicago Heights, for appellee Board of Education of School District No. 170.

JUSTICE MORAN delivered the opinion of the court:

This case involves the plaintiff school districts' challenge to the validity of the Rules Establishing Requirements and Procedures for the Elimination and Prevention of Racial Segregation in Schools (Rules). The Rules were promulgated by the defendant Joseph Cronin, the State Superintendent of Education (Superintendent), and adopted by the defendant State Board of Education (Board).

In cause No. 54738, Aurora East Public School District No. 131 (Aurora) brought suit against the defendants in the circuit court of Kane County for declaratory judgment and injunctive relief. The defendants filed a counstercomplaint alleging that Aurora failed to comply with section 10—21.3 of the School Code (Ill. Rev. Stat. 1977, ch. 122, par. 10—21.3), commonly referred to as the Armstrong Act. This act provides, in part:

> "As soon as practicable, and from time to time thereafter, the [local] board shall change or revise existing [attendance centers] or create new [attendance centers] in a manner which will take into consideration the prevention of segregation and the elimination of separation of children in public schools because of color, race or nationality."

The circuit court declared the Rules void, and permanently enjoined their enforcement. It further determined that Aurora's practices regarding segregation did not violate the Armstrong Act. A majority of the appellate court affirmed on the grounds that the Rules were unreasonable and arbitrary, and that the circuit court's ruling with respect to the counstercomplaint was not contrary to the manifest weight of the evidence. 92 Ill. App. 3d 1010.

In cause No. 55134, the defendants appealed an order of the circuit court of Cook County granting the board of education of Chicago Heights Public School District No. 170 (Chicago Heights) summary judgment on count I of its complaint for declaratory relief. The trial court went on to

state that the Rules were arbitrary, capricious and illegal, and a majority of the appellate court affirmed. (*Chicago Heights Public School District v. Illinois State Board of Education* (1981), 97 Ill. App. 3d 246.) We granted defendants leave to appeal in each instance and consolidated the cases for purposes of review.

The following questions are raised on appeal: (1) Does the Board have authority to promulgate and enforce rules designed to prevent racial segregation? (2) If so, are these particular rules valid? (3) Has Aurora failed to comply with the requirements of the Armstrong Act? Because of the results reached in this case, it is necessary to address only the first and third issues.

The Rules were originally promulgated in 1971 for the purpose of enforcing the Armstrong Act. Subsequently, in 1973, the legislature enacted the Moore Amendment, which provides:

"Nothing herein shall be construed to permit or empower the State Superintendent of Public Instruction* to order, mandate or require busing or other transportation of pupils for the purpose of achieving racial balance in any school." (Ill. Rev. Stat. 1977, ch. 122, par. 10—22.5.) [*In 1975, the duties of the Superintendent of Public Instruction were delegated to the Board. (Ill. Rev. Stat. 1977, ch. 122, par. 1A—4C.)]

In 1976, the rules at issue in this case were adopted by the Board. Under the Rules, each district must submit an annual report to the Board indicating the racial composition of the students in the district as a whole, and at each attendance center (Rule 2.2). The report is reviewed by the Superintendent for the purpose of determining whether any attendance center is in nonconformance (Rule 3.1). Rule 1.4 defines nonconformance as "[t]he condition in which racial segregation exists in the schools under any school authority, that is: (a) the minority racial composition of the pupils in any attendance center fails to reflect, within 15 percentage points, the minority racial composi-

tion of the pupils in all attendance centers under a given school authority." Thus, nonconformance as applied to racial segregation is defined in terms of a 15% plus or minus quota. For example, if a given school district is composed of 50% minority pupils, then the minority enrollment at each attendance center within that district must range from between 35% and 65% of the total enrollment.

If the Superintendent determines that a district is in nonconformance, he must promptly notify the district of that status (Rule 3.2). The district is then afforded 90 days in which to submit a plan in an effort to achieve conformance (Rules 4.1, 5.1). Upon receipt of the notification, the district may request that the Illinois Office of Education (IOE) provide technical assistance in devising a plan. Following receipt of such a request, the IOE must promptly furnish appropriate assistance (Rule 4.3).

Any plan offered by a district must contain "a detailed description of the specific actions to be proposed" and a timetable indicating the anticipated dates of implementation and completion (Rule 5.2). If the Board determines that a submitted plan is acceptable, the school is considered to be in compliance, and its efforts to implement the plan are subject to annual review by the Superintendent (Rule 6.5).

Under Rule 1.3, a school authority is considered to be in noncompliance if it fails or refuses to submit, amend or implement a plan in accordance with the Rules. Upon a finding of noncompliance, the school district is placed on probation (Rule 7.1). It remains in that status for one year, unless the cause for noncompliance has been removed (Rule 7.1(a)), or the Board determines that lesser measures are sufficient (Rule 7.1(b)). If a district remains on probation for one year without effecting compliance with the Rules, and it does not request a hearing, the Board may place the district on nonrecognition status (Rule 7.2). If a hearing is conducted, the Board will review the findings of

the hearing officer to determine if the district is in continued noncompliance. If it is, the Superintendent will place the district on nonrecognition status (Rules 7.4(d), (e)). When a district loses recognition, the Board may withhold all Federal funding to which the district would otherwise be entitled (Rule 7.4(g)).

The final relevant provision, Rule 6.1, states in part that "[w]here educational, physical or economic constraints would place an unreasonable burden upon the school authority in completely conforming, the State Board of Education may, in its discretion, waive the requirement of complete conformance in pupil assignment."

Turning to the facts in the instant cases, Aurora currently operates one senior high school, two junior high schools, and 11 elementary schools for children attending kindergarten through grade six. The total minority enrollment in the district, for the 1976 through 1977 school years, was 41.4%. Based on this percentage, certain elementary schools were substantially segregated within the meaning of Rule 1.4.

Due to the perceived condition of racial imbalance in Aurora, the Superintendent notified the district by letter, dated March 1, 1976, that it was in nonconformance and must submit a desegregation plan. The only reason given for the finding of nonconformance was the district's failure to achieve the plus or minus 15% quota in certain schools. Aurora organized a task force of teachers and administrators to devise a plan, which it subsequently submitted. In October of 1976, the Superintendent wrote another letter to Dr. John Hinck, the former superintendent of Aurora schools, in which he recognized the district's willingness and efforts to meet the requirements of the Rules. However, the Superintendent acknowledged that the plan submitted was insufficient, noting in particular the minority enrollment at the Brady, Beaupre, Oak Park, and O'Donnell schools. The record reveals that Dr. Hinck wrote to

the Superintendent requesting expert assistance in devising a plan "specifically limited to the consideration of alternatives other than a plan which involves reassignment of students requiring busing." The Superintendent responded that he would provide assistance but "[could not], however, accept [the] school board's stipulation that the work of this consultant would be limited to consideration of plans which involve no transportation of students." The Superintendent testified that he was aware the districts could not be required to bus, but he believed they should at least consider the option.

Mr. Royce Derks, a former employee of the State Board in the Department of Equal Education Opportunity, testified that he was aware of a plan that Aurora could implement which would conform to the Rules and not require busing. He indicated that Aurora could close the Beaupre school and assign the students to the Allen and Gates schools. Some of the Gates students could then be assigned to the nearby Bardwell school, and similar assignments could be made along each contiguous boundary line. According to Derks, this plan would not require students to attend schools located over $1\frac{1}{2}$ miles from their homes and thus Aurora would not have to furnish transportation. Section 29—3 of the School Code generally requires districts to provide free transportation for pupils residing over $1\frac{1}{2}$ miles from their attendance centers. (Ill. Rev. Stat. 1977, ch. 122, par. 29—3.) However, plaintiffs allege and defendants admit that Aurora is not the type of district in which busing is required under section 29—3.

Derks further testified that he never disclosed the plan to Aurora and that the Board did not recommend desegregation methods because it was not proper "to try to cram a plan down a district's throat." Nevertheless, it appears that Aurora considered closing Beaupre and reassigning the students to other attendance units. Dr. Cavanaugh, the assistant superintendent of elementary schools in Aurora,

testified that the plan was not implemented because it would require busing and there was a lack of available space in which to relocate the students.

Finally, in June of 1977, Aurora was informed that it would be placed on probationary status, effective in July, for failing to comply with the Rules. Although Derks apparently recommended that Aurora be granted a waiver under Rule 6.1, the Board declined to do so because of the alleged deficiencies in Aurora's submitted plan. Testimony indicated that the plan was unacceptable to the Board because it did not contain the requisite timetable for implementation, and no mandatory action was proposed. The plan provided for voluntary student transfers, an option which apparently only one family considered.

In the case involving Chicago Heights, the district operates one junior high school and 10 elementary schools for children attending kindergarten through grade six. In 1977, the total enrollment was 55.9% minority. Three of the elementary schools were predominantly white, and two were virtually 100% minority, in violation of Rule 1.4.

After being informed that it was not in compliance with the Rules, Chicago Heights was requested to submit a plan detailing its desegregation efforts. The district responded, by letter, that statistical compliance was not feasible because it would require large-scale busing. After Chicago Heights was formally found to be in noncompliance with the Rules, it submitted a plan which was subsequently deemed deficient. The district, after being granted an extended probationary recognition status, submitted another plan. In July of 1977, it was notified by the Superintendent that the plan was unacceptable and it would be denied recognition in 30 days unless a hearing was requested. Chicago Heights filed suit and subsequently requested a hearing on the condition that it would not be conducted until the court resolved the legal issues.

In concluding that the Board is authorized to promul-

gate rules designed to prevent segregation, the appellate courts relied on the recent opinion in *Coates v. Illinois State Board of Education* (7th Cir. 1977), 559 F.2d 445. In *Coates,* the court noted that the Board has the duty "[t]o supervise all the public schools in the State" (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.3) and "[t]o make rules necessary to carry into efficient and uniform effect all laws for establishing and maintaining free schools in the State" (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.6). Having determined that the Armstrong Act is such a law, the court concluded that the Superintendent may issue regulations designed to effectuate its policy. For the following reasons, we decline to adopt the reasoning expressed in *Coates.*

Initially, we note that our State constitution provides for free education through the secondary level. Additionally, "[t]here may be such other free education as the General Assembly provides by law." (Ill. Const. 1970, art. X, sec. 1.) It is clear that the term "free" is used in a monetary sense and imposes upon the public the burden of financing education. In turn, pursuant to section 2—3.6 of the School Code, the legislature delegated to the Board the duty to promulgate rules for establishing and maintaining free schools. (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.6.) Particularly in light of the quoted constitutional provision, there is every reason to assume that the legislature intended the word "free" to mean financially free. We find no indication that the term was meant to encompass racial equality. Consequently, we do not perceive the Armstrong Act as a law for establishing and maintaining free schools in the State.

Although not raised by defendants as an issue, they refer in two footnotes to article X, section 2(a), of the 1970 Illinois Constitution. This provision states in part:

"The Board, *except as limited by law,* may establish goals, determine policies, provide for planning and evaluating education programs and recommend financing. The Board shall have such other duties and powers as pro-

vided by law." (Emphasis added.) Ill. Const. 1970, art. X, sec. 2(a).

Even assuming that this section would ordinarily authorize the Board to promulgate the Rules, that authority has been limited by the General Assembly. The Moore Amendment, enacted subsequent to our 1970 constitution, places a clear limit on the Board's power regarding segregation and busing. As later discussed, prior to the enactment of the Moore Amendment, section 10—22.5 authorized *local boards* "[t]o assign pupils to the several schools in the district; to admit non-resident pupils when it can be done without prejudice to the rights of resident pupils and provide them with any services of the school including transportation; to fix the rates of tuition in accordance with Section 10—20.12a, and to collect and pay the same to the treasurer for the use of the district; *but no pupil shall be excluded from or segregated in any such school on account of his color, race, sex or nationality.*" (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 122, par. 10—22.5.) This provision placed the duty to prevent segregation squarely in the hands of the local boards. In passing the Moore Amendment, the legislature emphasized that methods of achieving desegregation are policy decisions to be made by the school districts.

Although not directly in point, section 34—18 of the School Code provides added support for our interpretation. This provision specifies the powers and duties of school districts with a population of 500,000 or more. Section 34—18 was amended in 1965 to include language substantially identical to the Armstrong Act. It was later amended in 1973 to add the language of the Moore Amendment. Thus, again, where the legislature has specified a district's duty to prevent segregating, it has limited the Board's authority to do so.

For this reason, we do not believe that the constitutional provision, standing alone, grants to defendants the extensive authority now sought. The question therefore

centers on whether any statutory provisions empower the Board to promulgate the Rules.

Defendants contend that, in addition to the statutory provisions relied on in *Coates,* section 2—3.25 of the School Code authorizes the promulgation of rules to enforce the Armstrong Act. This section provides that the Board shall have the power:

> "To determine for all types of schools conducted under this Act efficient and adequate standards for the physical plant, heating, lighting, ventilation, sanitation, safety, equipment and supplies, instruction and teaching, curriculum, library, operation, maintenance, administration and supervision, and to grant certificates of recognition to schools meeting such standards by attendance centers or school districts; to determine and establish efficient and adequate standards for approval of credit for courses given and conducted by schools outside of the regular school term." (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.25.)

Defendants compare the instant case with *Lenard v. Board of Education* (1979), 74 Ill. 2d 260, in which this court held that section 2—3.25 authorized the Superintendent to enact certain standards. However, there is a significant distinction between the two cases.

In *Lenard,* the Superintendent promulgated a rule relative to teaching standards which required that certain teachers have a minimum number of semester hours in each field to be taught. In concluding that the Superintendent was authorized to enact the rule, this court focused upon the language in section 2—3.25 which allows the Board to determine standards for "instruction and teaching." Clearly, the semester-hours requirement was a rule related to "teaching."

In the instant case, the defendants seek to promulgate rules relative to desegregation. Nowhere in section 2—3.25 is the Board granted express authority to determine standards for racial desegregation. And the fact that the Board may set standards for the "operation, maintenance, admin-

istration and supervision" of schools does not imply the authority now sought. If we were to hold otherwise, it would be difficult to conceive of any regulation which could not be justified under section 2—3.25.

"This court has consistently held that, inasmuch as an administrative agency is a creature of statute, any power or authority claimed by it must find its source within the provisions of the statute by which it is created." (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 551; see also *Northern Illinois Automobile Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 60; *City of Chicago v. Fair Employment Practices Com.* (1976), 65 Ill. 2d 108, 112-13.) The duties and powers of the Board are set forth in article 2 of the School Code. (See Ill. Rev. Stat. 1977, ch. 122, par. 2—3.) We have carefully reviewed the provisions therein, and are unable to find any which delegate to the Board the authority it now seeks. The most that can be said is that the legislature has granted the Board general rulemaking power (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.6) and the authority to supervise public schools (Ill. Rev. Stat. 1977, ch. 122, par. 2—3.3). We do not agree that these general provisions authorize defendants to promulgate and adopt rules relative to the Armstrong Act.

As plaintiffs point out, when the legislature intended to delegate authority to the Board, it did so expressly and specifically. For example, section 2—3.28 of the School Code grants the Board the authority "[t]o prescribe rules and regulations defining what shall constitute a budget and accounting system required under this Act. The rules and regulations shall prescribe the minimum extent of verification, the type of audit, the extent of the audit report and shall require compliance with statutory requirements and standards and such requirements as the Superintendent of Public Instruction deems necessary for an adequate budget and accounting system." (Ill. Rev. Stat. 1977, ch. 122, par.

2—3.28.) Section 2—3.34 allows the Board to establish rules governing high school equivalency certificates. Section 14—8.01 delineates the Board's rulemaking power relative to special education buildings and facilities. Under section 2—3.9, the Board may grant and suspend teaching certificates. There are numerous other provisions which specifically outline the Board's authority to establish regulations governing the school systems. Thus, although the Board is granted general supervisory and rulemaking power, the areas in which that power may be exercised have been detailed by the legislature. "The [Board] *** has been vested by the General Assembly with the duty of establishing standards in education, *along the lines delineated by that legislative body.*" (Emphasis added.) *Games v. County Board of School Trustees* (1958), 13 Ill. 2d 78, 82.

That the legislature did not intend to delegate to the Board the power which it seeks is apparent for another reason. There are no standards or guidelines governing the Board's discretion to enforce the Armstrong Act. "[T]he absence from the statute of any standards, criteria or procedure for [promulgating the Rules] confirms that no power to [do so] was intended by the legislature to be given the Board." *Chicago Division of the Horsemen's Benevolent & Protective Association v. Illinois Racing Board* (1972), 53 Ill. 2d 16, 19; see also *Thygesen v. Callahan* (1979), 74 Ill. 2d 404, 408.

Significantly, however, the legislature *did* establish a procedure by which the Board could combat segregation. Section 22—19 of the School Code provides, in part:

> "Upon the filing of a complaint with the Superintendent of Public Instruction *** alleging that any pupil has been excluded from or segregated in any school on account of his color, race, nationality, religion or religious affiliation *** by or on behalf of the school board of such district, the Superintendent of Public Instruction shall promptly mail a copy of such complaint to the secretary or clerk of such school board.

The Superintendent of Public Instruction shall fix a date \*\*\* for a hearing upon the allegations [in the complaint]. He may also fix a date for a hearing whenever he has reason to believe that such discrimination may exist in any school district. \*\*\*

The Superintendent of Public Instruction may designate an assistant to conduct such hearing and receive testimony concerning the situation complained of. \*\*\* The hearing officer shall report a summary of the testimony within 60 days after the hearing commences \*\*\* to the Superintendent of Public Instruction who shall determine whether the allegations of the complaint are substantially correct. \*\*\* The Superintendent of Public Instruction shall notify both parties of his decision within 30 days after he receives a summary of the testimony from the hearing officer. *If he determines that a violation exists, he shall request the Attorney General to apply to the appropriate circuit court for such injunctive or other relief* as may be necessary to rectify the practice complained of." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 122, par. 22—19.

We agree with the plaintiffs that this comprehensive provision limits, rather than expands, the Board's authority to regulate desegregation. Section 22—19 clearly recites the powers which the legislature intended the Board to have. Nowhere does the section authorize the Board to promulgate its own rules and sanctions for enforcing the Armstrong Act.

A similar situation was presented in *Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540. Although the Board claims that this case is inapposite because it deals with the Illinois Public Aid Code, we believe that the legal principles related therein are equally applicable to the School Code. In *Bio-Medical Laboratories*, the Director of the Department of Public Aid attempted to suspend the plaintiff from participation in a Medicaid program because he was suspected of fraud. In holding that the agency lacked authority to impose this sanction, this court stated:

"[E]vidence that the legislature did not intend the Di-

rector to have the authority now claimed can be found in section 12—4.2 (Ill.Rev. Stat. 1975, ch. 23, par. 12—4.2), which specifically authorizes the defendant to investigate fraud, but directs that such findings are to be referred to proper prosecutorial authorities for further action. Section 12—16, as related above, delegates to the Attorney General the authority to prosecute all necessary court actions to enforce all claims, penalties and obligations arising under the Code or other State law. (Ill. Rev. Stat. 1975, ch. 23, par. 12—16.) We find that the total absence of standards, criteria or procedures for terminating or suspending vendors, coupled with the express delegation of enforcement responsibilities, is persuasive evidence that the legislature did not intend to confer on the defendant the authority now claimed." 68 Ill. 2d 540, 553-54; see also *Chicago Division of the Horsemen's Benevolent & Protective Association v. Illinois Racing Board* (1972), 53 Ill. 2d 16, 19.

Similarly, section 22—19 authorizes the defendant to investigate districts suspected of maintaining segregation, and to refer complaints to the Attorney General for prosecution. The Board has completely ignored this provision and instead has adopted rules incorporating its own methods for dealing with perceived segregation. Defendants argue they may do so because section 22—19 is not intended to operate as an exclusive remedy. They rely for this proposition on *McNeese v. Board of Education* (1963), 373 U.S. 668, 10 L. Ed. 2d 622, 83 S. Ct. 1433, and *Rajala v. Joliet Grade School District No. 86* (1969), 107 Ill. App. 2d 410.

We do not find these cases apposite. *McNeese* held that students alleging segregation need not exhaust State remedies prior to maintaining a Federal suit under the Civil Rights Act. In *Rajala*, the appellate court determined that pupils may file suit in court instead of pursuing the administrative remedy outlined in section 22—19. Neither of these cases grant the Board authority to bypass the statutory procedure in favor of seeking an alternate remedy.

Further, if defendants were dissatisfied with the cur-

rent law, they could have requested a modification thereof. Section 1A—4C of the School Code provides, in part:

> "The Board shall analyze the present and future aims, needs, and requirements of education in the State of Illinois and recommend to the General Assembly the powers which should be exercised by the Board. The Board shall recommend the passage and the legislation necessary to determine the appropriate relationship between the Board and local boards of education and the various State agencies and shall recommend desirable modifications in the laws which affect schools." (Ill. Rev. Stat. 1977, ch. 122, par. 1A—4C.)

The Board has apparently disregarded this alternative in favor of pursuing its own policies without first securing legislative approval.

There is yet another reason which counsels against the defendants' authority to enforce the Armstrong Act. This provision is located in article 10 of the School Code. This article relates to the powers and responsibilities of the *local* school boards, not the Board. (See Ill. Rev. Stat. 1977, ch. 122, par. 10—20.) It is thus clear that the legislature has charged the local districts with the responsibility of enforcing the Armstrong Act. (See also *Tometz v. Board of Education* (1968), 39 Ill. 2d 593, 600.) Consequently, promulgating rules relative thereto should be the duty of the local school boards. See section 10—20.5 (Ill. Rev. Stat. 1977, ch. 122, par. 10—20.5) in conjunction with section 10—21.3 (Ill. Rev. Stat. 1977, ch. 122, par. 10—21.3).

Defendants argue, however, that the legislature impliedly approved the Board's authority to adopt the Rules. They assert that, by enacting the Moore Amendment, the legislature recognized the Board's power to promulgate guidelines and merely limited that power to exclude mandatory-busing. We do not agree that the express disapproval of a particular rule impliedly approves defendant's authority to promulgate and adopt the other rules.

As earlier related, prior to the enactment of the Moore

Amendment, section 10—22.5 granted to the *local boards* the authority "[t]o assign pupils to the several schools in the district; *** *but no pupil shall be excluded from or segregated in any such school on account of his color, race, sex or nationality.*" (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 122, par. 10—22.5.) Subsequently, the Board adopted Rule 1.4, defining segregation in terms of the 15% plus or minus quota. In passing the Moore Amendment, the legislature specifically addressed this particular rule, fearing that it would require the districts to implement an involuntary busing program. During the Senate debate, the sponsor of the Moore Amendment stated:

> "I think that we are aware that the Superintendent has promulgated guidelines which mandate a fifteen percent mixing of children because of race, color, nationality, and so forth. Wherever this has happened there has been tremendous resentment from the people. *** And I think that this bill will clarify the air as far as the authority of the Superintendent to promulgate such guidelines with the threat of withhold [*sic*] of State aid in the event the local school districts do not conform. This does not in any way prevent a local school district from busing *** if it ... sees fit." Senate Debates, Senate Bill 48, April 12, 1973, at 50-51.

Thus, the purpose of the Moore Amendment was to clarify that methods of preventing segregation are the obligation of the local boards, as implied in section 10—22.5. In performing this duty, the districts could not be required to bus students. There is no indication that, in enacting the amendment, the legislature thereby approved of any other Rules, or the defendants' authority to adopt them. The other Rules were simply not in question during the passage of the Moore Amendment and consequently the Board's authority to adopt them was not addressed.

Defendants assert that the trial and appellate courts erred in concluding that Aurora has complied with the Armstrong Act. We do not believe that this question is properly before us.

As previously indicated, section 22—19 of the School Code (Ill. Rev. Stat. 1977, ch. 122, par. 22—19) establishes the procedure by which defendants may combat segregation. In particular, if defendants investigate and determine that discrimination exists, they may request the Attorney General to file suit for appropriate relief. This procedure insures that the Board will not assume the role of prosecutor, judge, and enforcer of its own sanctions. Consequently, the proper course is for defendants to conduct a hearing and refer to the Attorney General any findings of discrimination. This is the extent of the Board's obligation. It is for the Attorney General, as representative of the People, to file suit when a district engages in discriminatory practices. Indeed, in other situations, it has been held that a school board lacks standing "to protest alleged racial discrimination, since it is not a member of the protected class of pupils." *Cronin v. Lindberg* (1976), 66 Ill. 2d 47, 56, citing *Board of Education v. Bakalis* (1973), 54 Ill. 2d 448, 467.

It is for the reasons stated herein that we affirm the judgments of the appellate court in the consolidated cases before us.

*Judgments affirmed.*

JUSTICE SIMON took no part in the consideration or decision of this case.